No. 5336.

NICHOLAS BURKE VS. JAMES WALL ET AL.

Where, in a claim for damages, based on a wrongful deprivation, or obstruction of some mental or moral gratification, or personal convenience, the plaintiff makes oath that his interest involved in the controversy amounts to more than five hundred dollars, it will suffice to give this court jurisdiction.

Whoever acquires the ownership of a lot of ground, whether by prescription or by any other form of acquisition, thereby acquires the right of way, and every other servitude incident to the property.

The property of an extinct religious corporation vests in the former individual members thereof, who may validly sell the same, in accordance with the customs

Burke vs. Wall.

they may have tacitly, or expressly adopted; provided such customs do not conflict with the laws of the State.

Where a lot in a cemetery is sold, with reference to a certain *plan*, on which plan appears a certain avenue, leading up to, or close beside the lot, affording a convenient highway to and from it, that avenue becomes a servitude in favor of the lot, and can not be legally obstructed.

A servitude may be shown by parol evidence.

When a church congregation, who own the soil of a cemetery, have for a great many years entrusted the administration of the cemetery, and the sale of its lots to the priests of their church, they clothe the priests with power to create servitudes on the soil of the cemetery, which will be binding on the congregation, and on all third persons.

The purchaser of a cemetery lot, whether he acquire an absolute or qualified property therein, is entitled to the equitable remedy of injunction, to protect him in the full enjoyment of the lot.

APPEAL from the Superior District Court, parish of Orleans. *Hawkins, J. James Timony* and *E. Bermudez*, for plaintiff and appellant. *Semmes & Mott* and *T. Gilmore*, for defendants.

The opinion of the court on the original hearing was delivered by MORGAN, J., and on the rehearing by EGAN, J.

In December, 1857, the plaintiff purchased a lot of ground in the St. Patrick's cemetery. The lot is the No. 18, in block No. 8.

He avers that he has caused to be erected on this lot a costly tomb. That he has enjoyed the servitudes belonging to the lot since his purchase thereof. He avers that James Wall and others are attempting to destroy the conveniences of his tomb by interring the dead and erecting tombs and monuments on one of the avenues leading thereto, thus destroying his use of the avenue, which is dedicated to public use.

He says that the acts of the defendants have caused him damages in the sum of one thousand dollars, for which he prays judgment. He also prays for an injunction prohibiting them from erecting tombs or monuments on the avenue named in his petition.

The defendants deny generally the allegations in the petition, and they specially deny that the plaintiff has any right or title to the property described, or the privileges, appurtenances, or right of way as described and set forth in his petition.

We do not think the defendants can question the plaintiff's title, or that it is questionable. He holds under a regular conveyance from a person who, we think, was authorized to sell, and his possession has been undisputed and undisturbed from the date of purchase (1857) until the acts now complained of.

Plaintiff purchased his property according to a plan which was shown him at the time. According to that plan the cemetery was divided into blocks, intersected by avenues. The lot he purchased is situated at the corner of St. Anthony and St. Dominick avenues. There are two entrances to the cemetery—one on Bayou road, the other on Canal street. His lot is very much nearer the Canal-street entrance than it is the Bayou-road entrance.

Entering the cemetery from Canal street, the route to his lot was down St. John's avenue one block to St. Anthony's avenue, and up St. Anthony's avenue the depth of a block, some twenty-five or thirty feet, to St. Dominick's avenue. Now, the obstructions complained of by the plaintiff are being erected on St. Anthony's avenue, between St. John's and St. Dominick's. If allowed to be completed, they will stop up the way to his lot by St. Anthony's avenue, and force him to go down one side of another block and up on the other, thus more than doubling the distance which he now has to make.

It is evident to our minds that the avenues in the cemetery were, when the plan thereof was made and the plaintiff's lot was purchased, dedicated to the use of those who purchased lots therein, and that no obstructions can be put upon them which would render that use either impossible or imperfect. If the owners of the cemetery can block up one avenue, they can block up another, and so on from avenue to avenue until all the tombs therein will be inaccessible. The rights of the owners of lots purchased when the right of way existed can not be thus destroyed.

It is therefore ordered, adjudged, and decreed that the judgment of the district court be avoided, annulled, and reversed, that the injunction herein issued be reinstated and made perpetual, and that the defendants pay the costs in both courts.

WYLY, J. I dissent, and will file my reasons hereafter.

---

### ON REHEARING.

This case is before us on a rehearing after a judgment against the plaintiff and appellant in the court below and in his favor in this court. Plaintiff claims the ownership and possession for many years of lot No. 18 in block No. 8 in St. Patrick's cemetery of the city of New Orleans, the lot being situated at the corner of St. Anthony's and Dominick's avenues. He alleges that soon after his purchase on the twenty-second of December, 1857, he erected thereon an elegant and costly tomb at the expense of about thirty-five hundred dollars; that he paid for the lot ninety-nine dollars; that he selected this a corner lot for its convenience and conspicuousness, and that he has enjoyed undisputed possession of said lot and all the servitudes thereunto belonging since 1857. He alleges that within a few days prior to the institution of suit the defendants have endeavored to destroy the convenience and conspicuousness of his tomb by erecting tombs and monuments in St. Anthony's avenue, thus obstructing petitioner's access to his tomb and destroying its conspicuousness, and *also* impeding the right which petitioner has *in common with so many others* to the use of these avenues, which have been de-

voted to public use ever since the formation of the cemetery. He alleges damage to the amount of one thousand dollars by the illegal acts of the defendants, and fears that others, encouraged by their example, will bury dead and erect tombs in the said avenue *and others* until access to his tomb becomes impossible for the purpose either of depositing the dead or paying the usual rites of cherished affection, and prays that defendants be perpetually enjoined from proceeding further in erecting tombs or monuments in St. Anthony's avenue, in St. Patrick's cemetery, and that they each be ordered to restore said avenue to its former condition.

To this petition the defendants answer by denying generally all its allegations, and specially deny that plaintiff has right or title to the *property*, the *privileges*, the *appurtenances*, or the right of way, described and set forth in his petition.

Before proceeding to the discussion of the merits, we must first consider a motion by the defendants and appellees to dismiss this appeal for want of jurisdiction, because the amount in dispute does not exceed five hundred dollars. The plaintiff has alleged that he will be greatly inconvenienced in and may be deprived altogether of the use of property costing him near thirty-six hundred dollars, purchased and used for a family burial place and devoted to the memory and deposit of the bodies of the dead. He alleges damages of one thousand dollars, and files an affidavit declaring that his interest in the matter in controversy amounts to over five hundred dollars.

This case may well be considered similar to those embraced in the third paragraph of article 1934 of the Revised Civil Code, which provides "that damages may be assessed without calculating altogether on the pecuniary loss or the privation of pecuniary gain to the party, where the contract has for its object the gratification of some intellectual enjoyment, whether in religion, morality, or taste, or some *convenience or other legal* gratification, although these are not appreciated in money by the parties, yet damages are due for their breach; a contract for a religious or charitable foundation, a promise of marriage, or an engagement for a work of some of the fine arts are objects and examples of this rule." Will it be argued that the depositaries of the dead and the sentiments of natural affection of the living relatives and friends are less sacred or less valuable than the examples enumerated? Again, this court has often taken jurisdiction of cases involving no money demand, as in cases of divorce or where some great public interests are at stake, not appreciable in money. In the case of Knight vs. Knight, 12 An. 59, for divorce unaccompanied by any money demand, the court maintained the appeal upon an affidavit of interest to an appreciable amount.

The petition to dismiss is overruled.

### ON THE MERITS.

The plaintiff claims both ownership and peaceful and uninterrupted possession since 1857, as owner of lot eighteen, block eight, in St. Patrick's cemetery, and of the right of passage along St. Anthony's avenue to and from his lot; that he is a resident of New Orleans : and both as one of the public, and as lot owner and possessor, that he is entitled to have removed the obstructions placed by defendants in the avenue, which has been devoted to public use since the foundation of the cemetery. If the evidence sustains any one of these allegations of right, he is entitled to relief, and it is not very material, in the opinion of the court, to what class of actions the present is to be assigned, or whether to any particular class, a matter upon which much stress has been laid in argument. An elementary principle of our law is that wherever there is a right there is a remedy. If the right of plaintiff, in the enjoyment of which he alleges disturbance, be an incorporeal real right, then he can maintain the action technically styled possessory. C. P., articles 46 and 47. The possession of incorporeal rights, such as servitudes and *other rights of that nature*, is only a quasi possession, and is exercised by the species of possession of which these rights are susceptible. Rev. C. C., art. 3432. Among the rights which are common to all possessors, whether in good or bad faith, are —

First—That they are considered provisionally as owners of the thing which they possess so long as it is not reclaimed by the true owner or person entitled to reclaim it, and even after that reclamation till the right of the person making it is established,

Second—That every person who has possessed an estate for a year or enjoys peaceably and without interruption a real right and is disturbed in it *has an action against the disturber* either to be maintained in his possession or to be restored to it in case of eviction, whether by force or otherwise.

Third—That such possessor may by prescription acquire the property of the thing which he thus possesses after a certain time, which is established by law according as he has possessed in good or bad faith. Rev. C. C., art. 3454. Article 3455, Rev. C. C., provides that " the action which a possessor for one year has against a person disturbing his possession to be maintained in or restored to it as is said in the preceding articles shall be decided before pronouncing on the question of ownership, and the real owner shall not be allowed to repel it by endeavoring to prove his right." This is the possessory action proper. He who acquires an immovable in good faith and by a just title prescribes for it in ten years. Rev. C. C., art. 3478. " The possessor in good faith is he who has just reason to believe himself the master of the thing which he possesses, although he may not be in fact, as happens to him who buys a thing

Burke vs. Wall.

which he supposes belongs to the person selling to him, but which in fact belongs to another." Rev. C. C., 3451. By the term "just title" in cases of prescription we do not understand that which the possessor may *have derived from the true owner*, for then no true prescription would be necessary, but a title which the possessor may have received from any person whom he honestly believes to be the real owner, provided the title were such as to transfer the ownership of the property provided it had been derived from the real owner. Rev. C. C., articles 3484 and 3485. Good faith and possession as owner are always presumed in matters of prescription unless it appears that the possession began in the name of and for another. Rev. C. C., articles 3481 and 3488.

Without for the present discussing the precise nature of the property or rights acquired by the plaintiff by the act of sale from Father de la Croix, of the twenty-second of December, 1857, to the lot claimed by him, the evidence fully establishes his peaceable and uninterrupted possession and enjoyment under claim of ownership of lot eighteen in block eight of St. Patrick's cemetery, and of all its accessory rights, including the use or right of way along St. Anthony's avenue, from the date of the title for more than ten years and up to within a month or two before the institution of this suit, when the defendants placed in St. Anthony's avenue the obstructions complained of. It is also clear that the plaintiff was in perfect good faith, and believed himself to have acquired title from the true owner of the soil, whether he did so or not; therefore if his title be such as to convey ownership of the property, he comes within the rules laid down in the Code for acquiring title to real estate by the prescription of ten years, and had so acquired it before the alleged disturbance. It is also true that he bought by the plan of the cemetery filed in evidence, and with reference to it, which thus became part of the title, and that at the time of the purchase, and since, until the disturbance complained of in this suit, he and all other lot owners or persons enjoying the right of burial in St. Patrick's cemetery, and the public, enjoyed the unobstructed right of passage through St. Anthony's avenue, as well as all other benefits which he may have derived from the situation of his as a corner lot.

And while it is true that, viewed merely as an accessory right or servitude for the benefit of particular property, the non-apparent discontinuous right of passage can not be acquired by prescription for any length of time without a title, it is a mistake to suppose that a person who acquires title by prescription to a piece of property, although not from the true owner, does not at the same time acquire the rights of passage and all other rights incident or accessory to the property so acquired by prescription. It is urged, however, with much zeal by the counsel for the defendants, that the property in the soil of the cemetery

is still in the defunct corporation, the Roman Catholic church of St. Patrick, incorporated in 1833, by special act, with a duration of only twenty years, and which therefore expired in 1853, and that since that date no title could be conveyed by the extinct corporation, because it was extinct, nor by any one else, because the property is still in the corporation.

We can not assent to this proposition, which can hardly have been seriously urged by the eminent counsel for the defense in this case. It is well settled that the property of corporations becomes vested in its members upon the dissolution of the corporation. See 7 An. 287. In this case, in the members of St. Patrick's church, a religious body, which has continued to exist up to this time in a non-corporate capacity, so far as appears from the evidence, and which, through its priests and officers, has continued to control St. Patrick's cemetery, and to sell rights of burial in sepulture or lots in the cemetery, according to the testimony in the record, until so many burial lots have been sold, and so few remain to be sold that it is now attempted to convert avenues into lots, doubtless with a view to church revenue, and, it would seem, without reference to the convenience or wishes of those who acquired property or rights in the cemetery with reference to the plan, and to the use of these avenues, then open, including St. Anthony, the closing and obstructing of which is complained of in this case. Religious corporations or associations are, however, like all others, bound by their contracts, and by the principles of good faith and obligation which rest upon individuals under like circumstances. "*Sic utere tuo ut alienam non ludos*" is a maxim as old as the law itself, and we are indebted to one of the authorities quoted in the brief of defendants' counsel, Kincaid's Appeal, 66 Penn. 411, for its renewed expression in this language: "Every right, from absolute ownership to an easement, is held subject to the restriction that it shall be so exercised as not to injure others." While, then, we have no disposition to restrict the priests or congregation of St. Patrick's church, were they parties to the record, as they are not, in the exercise of all legitimate control over St. Patrick's cemetery, both they and those claiming as holding under them must be reminded to conform to these principles.

In 12 Harris's Penn. Rep., p. 249, another law quoted by defendants' counsel, it was held that "religious corporations are voluntary associations, governed by rules of their own, and not by the laws of the State. The supreme authority of the State must, however, sometimes exercise control, but then it generally takes the laws and customs of the church as its guide, just as between individuals it takes their contracts and usages, and only for want of them resorts to the general laws of the land." We accept this as a correct exposition of the law, with the lim-

itation that the rules and customs of the church must not contravene the laws of the State. In the case of Beatty vs. King, 2 Peters 566, it was held that "there was no proof of authority in plaintiffs except parol, and that they assumed to act without question of their authority, and formed part of the Lutheran Society, a religious body, and yet in a most import-- ant litigation, involving valuable property and large interests, the church. congregation was held to be properly represented by them. It appears from the evidence that the plaintiff acquired his title and whatever rights it conveys according to the customs and usages of St. Patrick's church,. and from the priest, who, as shown by Father Allen's and other testi-; mony, makes all the titles.. He says that he has himself sold fifty or sixty lots in the cemetery; that nearly all the lots have been sold, so that. space is well-nigh exhausted; and although defendants set up in their; answer no title in themselves, Father Allen, the priest in charge, tells us that he sold to them the lots in St. Anthony's avenue, their occupancy and use of which closes the avenue, and is complained of by plaintiff.. Indeed, it is apparent from the whole evidence that plaintiff's title is of the same character, and derived from the same source, with those which. have conferred whatever rights are enjoyed by any one in this well-filled, city of the dead, certainly since the death of the corporation *eo nomine.* The plaintiff tells us that he bought in 1857, by the plan filed in evidence,, the correctness of which is admitted; that St. Anthony's avenue was then open, and he selected his lot because it was a corner lot, and could have bought others at the time for less money. Father Allen tells us this is. the only plan transmitted to him; and that it is the only plan of the ceme-; tery is not controverted.

And while the precise date of its execution is not shown, it is evident. that it was in existence some time before 1857, probably as early as 1854, and that all sales of lots have been made by it till the near ex- haustion of lots induced the church authorities to attempt. the closing of this avenue. If they have such power, and can confer rights upon and induce others to occupy the avenues, it may well be asked where is. the exercise of this power to stop. Perhaps the present or some suc- ceeding priest may consider it proper to close still other avenues, until the beauty and plan of the cemetery and the convenience and rights of existing lot owners may be entirely sacrificed.

The evidence of both plaintiff's and defendants' witnesses shows what is apparent from the plan, that the closing of St. Anthony's avenue will double the distance in approaching plaintiff's burial lot from the Canal- street entrance, within twenty feet of which the cars stop, and by which most persons visiting the cemetery enter, and according to some of the witnesses, though partly contradicted by the priest, through which bodies are often carried for interment. One witness also says "the Canal-street

entrance is the usual entrance for funerals." It is evident that plain-tiff will be put to inconvenience at least, and that whatever be the nature of his rights or of his contract with the church, it has been violated by the closing of St. Anthony's avenue with the assent of the church authorities,: and he is entitled to the protection of the law. The defend-ants are either mere trespassers, or holding under and from St. Patrick's church.

Under the facts of this case the church itself could not close these avenues, or render their use more inconvenient, if objected to, so long as the ground is used as a cemetery. And the defendants are in no better position, to say the least of it.  C. C.,. article 777.

The plan of the cemetery has the word " entrance" over the Canal-street entrance, and it appears from the evidence that the gate, which is similar to that on the Bayou road, has been closed within the last two or three years, while the plaintiff states in his evidence that the " open-ing " or entrance has been there as long as he recollects going to the graveyard, which was doubtless even earlier than the time of his pur-chase in 1857.  That not only the plaintiff but the other lot owners and the general public have for many years used this entrance, and the avenues within, including St. Anthony's; is clearly shown, and has not been controverted by either evidence or argument.

It further appears by reference to the act of incorporation of the Roman Catholic church of St. Patrick's, sessions acts of 1833, that the cemetery was to be and remain subject to the control of the city authori-ties of New Orleans if within its limits, otherwise to that of the police jury of the parish of Orleans.  This fact, coupled with the plan, the open entrance place, and their long-continued and habitual use of the avenue, at least by the general public, as well as by the lot owners, would come very near constituting a dedication of them to public use, and would certainly do so to the use of the lots and those holding them, whether their titles be absolute or qualified, or right to the soil or in and over it.  If this constituted a dedication to public use, it is well settled that that dedication may be shown by parol.  Pickett vs. Brown, 18 An. 560; 21 An. 244, and numerous other cases.

In 9 An. 445, it was held that where a property owner made a plan representing various lots on either side of an alley and sold lots on one side according to the plan, that alley constituted a servitude, not merely for the lots sold, but for the property on both sides of it.

In the case of Rogers vs. McGinnis, 12 An. 108, it was held that a right of way accompanied by possession can be established by parol, even without a plan, in favor of the adjoining property for the conven-ience or necessity of which it has been used.  But is said that none but

the owner of property or his authorized agent can create a servitude upon it. The answer here is—

First—A plan of the cemetery, which is traced back beyond the knowledge or memory of the witnesses, who testified to its existence for over twenty years in the hands and keeping of the priests of St. Patrick's church, the congregation of which was and is owner of the soil, except so far as they have made titles to it.

Second—The habitual use of the place by the recognized authorities of the church during all these years, and the making sales of lots in the cemetery.

Third—The long-continued and habitual use, occupation, and enjoyment of the cemetery and its lots, according to this plan, by the members of the congregation itself and its priests and officers, and of the avenues marked on the plan, not only by them but by the general public.

Fourth—The well-known and established custom of the congregation to act in the control of the cemetery and the sale of burial lots in it through and by its priests. See evidence of Father Allen, who testifies directly to this effect, and also of the other witnesses.

Fifth—The written title or act of sale to the plaintiff and the testimony, received without objection, of numerous similar sales to other parties.

All this could not have been done without the knowledge and concurrence, if not the direct authority, of the congregation of St. Patrick's, who, in the language before quoted from the case in 2 Peters, did not question the authority of the priests, who formed part of the society or congregation. Under all these circumstances, were it the congregation itself which was questioning or interfering with the exercise of plaintiff's rights, instead of persons who have intruded recently upon his long-time possession and enjoyment of his property and the avenues of approach to it, without setting up any title in themselves, we should regard the congregation itself as estopped from such interference as is complained of, certainly so long as the cemetery continues to be used as such. It can not be that either law or good faith will permit persons to be induced on the faith of agreements, whether titles or not, or whether written or not, to deposit on or in the grounds of another the ashes of their valued dead and with commendable piety and affection to erect costly monuments to their memory and honor, and then that either the expressed or implied conditions of the agreement shall be broken and disregarded with impunity. This would be a clear case of estoppel by conduct. Still less can it be said that the plan and convenience of access to the tombs of a cemetery through its accustomed avenues can be impaired or obstructed by strangers without title, and setting up none, and

long-used rights taken away, and that the law gives no remedy. To, hold otherwise would do violence to the peace of society, to our sense of right, and to that necessary and wholesome rule, before quoted, that the possessor, whether in good or bad faith, is considered provisionally as owner against all the world except the true owner. The appropriate and peaceful remedy is the one to which the plaintiff has resorted in this case, that of injunction, to stay and to undo the mischief. C. P., article 298, paragraph 5, expressly authorizes injunction when the plaintiff is disturbed by the defendant in "the actual and real possession which he has had for more than a year, either of a real estate or of a, real right *of which he claims* the ownership, the *possession*, or the *enjoyment*." It is not ownership or title alone, then, which can be thus protected and preserved, but "possession and enjoyment" likewise. And here it may be well to remark that it is not the " ownership, the possession, or the enjoyment" of plaintiff's burial lot and tomb which are the real matters in controversy in this case, but the right and enjoyment of passage through and over St. Anthony's avenue, which he in common with so many others has possessed and enjoyed through so many years without interruption till the acts of defendants complained of, a right which for all the purposes of this case might be independent of his title to or ownership of the lot itself.

The case has been argued as though such title were necessary. We do not think so, and certainly not in a case of this character, against persons who have acquired no right of possession, and who set up no title in themselves.

We have examined the authorities cited by the brief of the learned counsel for the defense (except one or two which neither they nor we have been able to find) in support of the proposition that the act of sale to plaintiff gave no right of ownership, no proprietary right in the land, and conveyed but the right of sepulture, which is held subject to the right of the cemetery owners to remove the cemetery under certain conditions by remunerating the lot owners for their deprivation. As no such right of removal of the cemetery is or has been exercised or attempted in the case at bar, and as the cemetery owners are not parties to this record, that question does not arise here, and whatever rights the plaintiff acquired by his deed of purchase or otherwise still exist. All of the cases referred to are cases of the exercise of the right of removal of the cemetery by religious corporations or associations, by virtue of which the cemetery ceased to be used as such, a case which frequently arises in crowded populations, and even then it is required that compensation be made to the lot owners, or an equally good place of sepulture be afforded them, which of itself is a recognition of their right, defeasible and terminable only by the happening of the event or contingency named.

In Kincaid's Appeal, 66 Penn. and 5 Ann. Rep., the court held that the lot owner in a cemetery purchased a license—nothing more—*irrevocable* so long as the place continued a burial ground, but giving no title to the soil. Whether it was an incorporeal hereditament descendible from him or passed to his personal representatives, it is unnecessary to decide. While the license continued he could, perhaps, bring trespasser case for any invasion or disturbance of it, whether by the grantor or by strangers.

In 5 Barbour, 131, the court held that the sale of a pew in a church is a sale of an interest in real estate. In 109 Massachusetts Rep. 1, the court held "the removal of tombs and bodies by order of the church authorities to a new place of sepulture was no violation of the rights of property. if provision is made for compensation." This was a case of abandonment of the old and removal to a new cemetery by the church authorities, and the court said further, "it is not necessary to decide the class of property, whether mere license or not." 4 Sandford's Ch. Rep., 471, was a case of injunction against the *church authorities* to prevent removal of bodies to another cemetery, and no title had passed to any vault or portion of ground. The case of Brice vs. Methodist Episcopal Society, 4 Ohio Rep., 515, holds that the interests of persons having the right of burial assimilates that of pew-holders, which is limited and usufructuary," and that the party acquires only a qualified right of property. The court, however, fully recognizes the authority of Beatty vs. King, 2 Peters 566, to which we shall presently again advert, and says: "We should incline to restrain them (the church society) from any wanton breaking up of graves." 32 Barb. p. 42-47, distinguishes between the right of burial in a church-yard and that "in a separate and independent cemetery," and says in the former case "it is an easement and not a title;" thus implying that in the latter it is more than an easement, that it is a title. In the same case the court says: "Any deed of conveyance, whether of a pew, or a vault, or a house, is a contract between the parties, to be interpreted according to their actual or fairly presumed intent." In the case of Beatty vs. King, 2 Peters 566, where, as in the case at bar, the disturbance complained of was at the hands of a private person and not of the church, the court held that "the law protects tombs and rights of interment from sale or disturbance," and that "the remedy is by injunction to preserve the ashes of the dead and the religious sensibilities of the living," and that "any member of a voluntary society may sue, having a common interest for purposes common to all and beneficial to all."

It will be remembered that article 456 Revised Civil Code, 447 of Old Code, provides that "the provisions of the ancient laws concerning the distinction of things into things holy, sacred, and religious, and the inalienability of these kinds of things are abolished; and nothing pre-

vents the corporations or congregations to which these things belong from alienating them, provided it be done in the manner and under the restrictions prescribed by their acts of incorporation."

What, then, was to prevent the congregation of St. Patrick's Catholic church from selling an interest in or part of the soil of the cemetery? The language used in the deed to plaintiff, after reciting the consideration, is: "I have sold and by these presents do sell and convey to Mr. Nicholas Burke a certain lot of ground as a family burial-place," "to have and to hold the same for himself and heirs forever." Then come the conditions of the sale, that "the lot shall only be used as a family burial-place, and that none but such as depart this life in communion with the Roman Catholic Church shall ever be interred therein."

How would such a sale or contract be interpreted if made between private persons or of property other than that of a religious body? and if the law makes no distinction, how can the courts make it?

But under the views already expressed it is unnecessary for us to go so far in the present case, and it is a sufficient answer to all the authorities as to the character of the plaintiff's rights cited by the learned counsel for the defense that not only absolute but qualified property is under the protection of the law, and that "not only servitudes but leases and all other rights which the owner has imposed on his land" form real obligations, and constitute real rights, C. C., 2015 and 2012, for the disturbance in the ownership the possession or the enjoyment of which the claimant may resort to the remedy of injunction. See again paragraph five of article 298 C. P., before quoted.

The peculiar and unusual character of this case, its to some extent public importance, the zeal with which it has been argued on both sides, and the fact that it has been the subject of two former and contradictory decisions, one against the plaintiff by the court below, and the other in his favor by our immediate predecessors, who also granted the present rehearing, have induced us to give the case a more lengthy examination and elaborate review than our own views of the case would have rendered necessary.

For the reasons assigned it is ordered that the judgment of the court below be avoided and reversed, and that the injunction of plaintiff be perpetuated, with costs of both courts.