245 So.2d 385

**John E. ROBICHAUX et al.**

**v.**

**Louis HUPPENBAUER.**

**No. 50499.**

Feb. 24, 1971.

Concurring Opinion March 12, 1971.

Rehearing Denied March 29, 1971.

John L. Dorsey, New Orleans, for plaintiff-respondent.

Selenberg & Selenberg, Roland R. Selenberg, Metairie, for defendant-relator.

SUMMERS, Justice.

Plaintiffs are two neighboring property owners and two tenants all occupying dwellings near defendant Huppenbauer's horse stable located at 1618 Annette Street in the city of New Orleans. This suit was brought to · permanently enjoin defendant from operating the stable or keeping horses on the premises. After trial, judgment was rendered enjoining defendant as prayed for. On appeal to the Fourth Circuit the judgment was affirmed. 231 So. 2d 626. On defendant's application we granted certiorari limited to the contention that the Court of Appeal erred "in applying a positive injunction totally prohibiting defendant's operations, instead of limiting them in scope or manner." 256 La. 64, 235 So.2d 94.

Defendant uses the stable in connection with his business of providing horse drawn carriages for hire by tourists in the historic French Quarter or Vieux Carre Section of the city. The stables are about one mile from the French Quarter. These carriages are vestiges of a bygone era adding color and character to a section which is one of the city's outstanding attractions to visitors and tourists. Fifteen men are employed in the business of maintaining the horses at the stables and driving the carriages. The stable has been in operation for many years, even beyond the memory of the participants at the trial.

The lot, where the stable is located and where the horses are kept, has a frontage of 32 feet on Annette Street and runs 90 feet back into the block. All but 15 feet of this front portion is occupied by a dwelling house in which one of defendant's employees resides, the fifteen foot strip being used as a driveway. Behind this front portion the lot widens to 64 feet and extends back an additional 100 feet into the block. The horses are principally stabled, fed, washed and exercised on this 64 by 100 foot section.

For a short time prior to acquiring the stables in July 1968, defendant kept horses there under arrangement with the owner. When he acquired the property in August 1968, however, the Director of the Bureau of Public Health Sanitation, Charles J. Miramon, filed an affidavit charging violations of city ordinances regulating the harboring of rats and the removal of manure. At that time, according to Miramon, the stable did not comply with the standards prescribed by the Bureau, and it was a health menace.

Later, in September and October 1968, while these charges were pending in the Municipal Court, defendant's stable was inspected by James Bryant and Harold Clark, Sanitarians in the Bureau of Public Health, who found the stable free of any condition violative of the city's ordinances or their regulations. On the basis of these inspections, the charges were dismissed.

This suit for injunction was then filed and the case was tried on February 27, 1969, resulting in the injunction. Plaintiffs' petition charges that the use of the premises at 1618 Annette Street as a stable results in the deposit of manure on the lot which is responsible for nauseous odors, flies and insects and creates a stench, all of which infest the neighborhood and permeate the houses nearby.

At the trial, plaintiffs' witnesses, who lived very near the stable, some as close as four feet, testified that from eight to eighteen horses are kept there. Rats and flies, particularly horseflies, breed in the

manure and urine deposited by the animals. These pests are prevalent on the lot and swarm onto the adjoining property endangering the health and destroying the peace and tranquility of plaintiffs' homes. Noxious odors remain in the neighborhood. At times the horses drop manure on the street and sidewalk as they move to and from the stable. And when it rains the manure runs from beneath the gate of the horse lot onto the sidewalk and into the gutters in front of the nearby houses. The departure and arrival of the carriages, waste disposal vehicles and the animals cause noises and disturb the plaintiffs' sleep and repose.

Plaintiffs rely upon Article 669 of the Civil Code to support their claim that the nuisance resulting from the stable should be abated. That Article must be read with Articles 666, 667 and 668.[1] Article 666 declares that the law imposes upon the proprietors various obligations towards one another, independent of all agreements. Those obligations are prescribed in subse-

[1]. La. Civil Code arts. 666, 667 & 668:

*Art. 666:*

"The law imposes upon the proprietors various obligations towards one another, independent of all agreements; and those are the obligations which are prescribed in the following articles."

*Art. 667:*

"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."

*Art. 668:*

"Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.

"Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage."

quent articles of the Code. Article 669, upon which plaintiffs rely, provides:

> If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.

Regrettably the present version of Article 669 deleted "the other different inconveniences which one neighbor may cause to another" which appeared in the corresponding article of the Code of 1808. If this omitted language had been incorporated in Article 669 we could say that all of the inconveniences complained of in this case are covered by Article 669. As it is, however, only one of the several grounds alleged as a basis for the injunction—nauseous smells—is mentioned in the Article. We would prefer to say that smoke and smell are merely illustrative, but in view of the omission in the present Code of any reference to "other inconveniences" serious doubt must be entertained that smoke and smell are mere illustrations of inconvenience. The implication from the change is that the Article's effect must be confined to smoke and smells. What the Article means, as we understand it, is that no servitude is imposed upon the neighboring properties insofar as smoke or nauseous smells are concerned, those matters being left to the regulation of the police or custom.

Thus, whereas Article 667 and the articles which follow impose reciprocal servitudes or restraints upon neighboring properties respecting the making of works which may damage a neighbor, Article 668 makes it clear that while the liberty to do what one pleases on his own ground does not mean that a neighbor may be damaged, some inconvenience may result to a neighbor from the use of one's property which the law does not reprobate. The Article illustrates by referring to buildings which impair a neighbor's light as being a mere inconvenience a property must expect to suffer from a neighbor's free use of his own.

In substance the Article relied upon only partially applies here—to nauseous smells—and then only to the extent of declaring that, as to this, no servitude is established by the Code on neighboring properties, resort being necessary to police regulation or custom to ascertain the extent to which nauseous smells must be endured. Cf. Planiol, Vol. 1, Nos. 2906, 2908; Aubry et Rau, Property § 194 et seq.

The principle is clearly stated in Aubry et Rau, supra, as follows:

> Although in principle it is not prohibited to cause nuisances to a neighbor by noise, smoke, gases, steam, radiation,

tremors, dust or odor, such a damage becomes illegal when the source exceeds certain intensity. Until then no claim is possible for one cannot expect to live in a group without causing some inconvenience to neighbors.

Despite the apparent failure of these articles to deal explicitly with the standards to be followed in operations which may cause inconvenience to neighboring property or the failure of these articles to more comprehensively enumerate the "other inconveniences", they have nevertheless been employed by this Court together with the common-law theory of nuisance to grant relief where a use of property causes inconvenience to a neighbor.

█ The existence of a remedy under the city's health ordinances, as here, does not deprive the affected neighbor from bringing an action in damages before the Courts. Pendoley v. Ferreira, 345 Mass. 309, 187 N.E.2d 142 (1963); Aubrey et Rau § 194 et seq.

█ Thus the principle is enunciated in the cases that within reasonable limits the individual citizen has to submit to some annoyance and inconvenience from the legal exercise of the rights of others. Courts, therefore, will require strict proof that the activity carried on is of sufficient intensity, annoyance and inconvenience that he who causes it has created a nuisance which must be abated. State ex rel. Violett v. King, 46 La.Ann. 78, 14 So. 423 (1894).

█ Thus noxious smells, rats, flies and noise may constitute an actionable nuisance although produced and carried on by a lawful business, where they result in material injury to neighboring property or interfere with its comfortable use and enjoyment by persons of ordinary sensibilities. McGee v. Yazoo & M.V.R. Co., 206 La. 121, 19 So.2d 21 (1944).

██ Nuisances by their nature are nuisances per se or at law, and nuisances per accidens or in fact. A nuisance at law or a nuisance per se is an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings. Nuisances in fact or per accidens are those which become nuisances by reason of circumstances or surroundings.

██ In the case of a nuisance per se, the thing becomes a nuisance as a matter of law. Its existence need only be proved in any locality and the right to relief is established by averment and proof of the mere fact. But whether a thing not a nuisance per se is a nuisance per accidens or in fact depends upon its location and surroundings, the manner of its conduct, or other circumstances. In such cases, proof of the act and its consequences is necessary. Borgnemouth Realty Co. v. Gulf Soap Corporation, 212 La. 57, 31 So.2d 488

(1947). See also 39 Am.Jur., Nuisances, § 11; 66 C.J.S. Nuisances § 3.

■ A stable used for horses and other animals is not a nuisance per se. Simonetti v. Carlton, 17 Ala.App. 105, 82 So. 553 (1919). Whether any particular stable is or is not a nuisance is essentially a question of fact, in the determination of which, the stable's location, its construction, and the manner in which it is conducted are elements to be considered. Hill v. Battalion Washington Artillery, 143 La. 533, 78 So. 844 (1918); Oehler v. Levy, 234 Ill. 595, 85 N.E. 271 (1908); Taulbee v. Miller, 225 Ky. 516, 9 S.W.2d 296 (1928); Francisco v. Furry, 82 Neb. 754, 118 N.W. 1102 (1908).

■ Hence a stable in close proximity to a residence, in a residential section of the city, and kept in such a condition that it is unsanitary, and from which noxious and offensive vapors, fumes, smells, odors, and stenches arise during a period of twelve months, and enter into and spread and diffuse themselves over the adjoining residential property, is such a nuisance as will sustain an action. Simonett v. Carlton, supra.

■ The record satisfactorily demonstrates, and it is conceded, that the maintenance of defendant's stable is not prohibited by any law, property restriction or zoning regulation, and it is not a nuisance per se on this account. The record also supports the conclusion that the stable is a nuisance because of the manner in which it is operated. However, we have not been shown that it is impossible to maintain this horse lot and stable in such a manner as to free it from the complaints which the plaintiffs make, therefore we will not abate the business entirely. Francisco v. Furry, 82 Neb. 754, 118 N.W. 1102 (1908). Instead we will permit defendant to continue his operations under the following mandates, restrictions and injunctions:

Spray ground and premises generally and thoroughly with a disinfectant and deodorizer, approved by the local health authorities, at such intervals as may be prescribed by those authorities.

Dispense rat poison at strategic locations about stables, sheds and bins and renew weekly.

Feed bins should be covered and so constructed as to deny rodents access to feed.

Remove all manure and other waste daily.

Limit the number of horses using the lot and stables to ten.

Keep the premises properly drained to prevent water from standing there.

For the reasons assigned, this matter is remanded to the trial court where an injunction, mandatory and prohibitive, shall issue against defendant without delay in

accordance with the mandates and restrictions enumerated above. The judgment, order and decree so issued shall prescribe compliance therewith by defendant within two weeks, failing in which he shall be subject to punishment for contempt of court, all in accordance with law. The right of plaintiffs to renew their complaints if compliance by defendant proves unavailing to abate the nuisance is reserved. Tucker v. Vicksburg S. & P. R. Y. Co., 125 La. 689, 51 So. 689 (1910); Hill v. Battalion Washington Artillery, 143 La. 533, 78 So. 844 (1918).

BARHAM, J., concurs and will assign written reasons.

HAMLIN, J., dissents, being of the opinion that the result reached by the Court of Appeal is correct.

TATE, J., dissents and assigns written reasons.

TATE, Justice (dissenting).

I respectfully dissent.

The trial court, who saw and heard the witness, stated in his reasons for judgment that the "weight of the *believable* testimony" showed that the keeping of ten to sixteen horses in this thickly settled neighborhood created loathesome odor and stench and attracted flies and rodents. The court of appeal affirmed the trial court's issuance of an injunction which prohibited as a nuisance the continued operation of a stable on the premises.

The testimony shows that, even though the defendant complied with the (minimum) standards of the local health authorities, even though he removed manure and other waste (once) daily, even though he sprayed and poisoned, even though he covered his feed bins—in short, even though he met all those (minimum) requirements permitted by our limited injunction—, nevertheless the maintaining of ten horses or so on the premises (surrounded by residences, some with people sleeping just four feet from horses) created intolerable stench and attracted rodents and flies which made the neighborhood unbearable.

The testimony of Charles Miramon, Director of the Bureau of Public Health Sanitation of the City of New Orleans, is of great interest. He noted that he himself had inspected the premises and, upon finding the conditions complained of, issued an order for the horses to be removed from the premises. He stated that he also filed affidavits for local criminal processing. "Unfortunately", he said, the prosecutions were dismissed, as (he stated) was usually the case with this local enforcement agency. He stated the stables were a "health menace" and a "rat harbor" and that the enterprise had no permit, as required by law, to maintain horses in those premises in the city.

Director Miramon further testified that it was the function of his office, under the State Sanitary Code, to issue permits for maintaining horses. However, he stated, "we could not issue such permits because we have found from experience that it is a false sense of security because unsanitary conditions usually arise whereby horses are maintained in thickly populated areas, and this was a thickly populated area."

I respectfully dissent from our modifying the injunction. In view of the strong evidence supporting these decrees of the previous courts, we should not disturb their considered judgment that the neighbors should have relief—that, because of the unavoidable intolerable stench, noise, and pest-attracting filth resulting from this stable, its continued operation on this narrow lot in this thickly settled neighborhood should be enjoined.

BARHAM, Justice (concurring).

I concur in the result which affords the defendant an opportunity to take corrective measures to abate the severe inconveniences caused the plaintiffs, his neighbors, because of his operation of a stable. However, I am of the opinion that the result should have been reached soley by the application of the civil law, more particularly Civil Code Article 669, without resort to common law authority or terminology. In Reymond v. State Through Department of Highways, 255 La. 425, 231 So.2d 375, at footnote 6, it was stated in dictum that Article 669 was the vehicle for defining the limits of the activities of man in use of property as they affect his neighbors.[1] That article provides: "If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place."

It was further stated in Reymond that although this article appears under a title and chapter dealing with servitudes, it does not in fact establish a servitude. That opinion pointed out, as has the majority here, that as originally adopted in our law (Article 17, p. 130, of our Code of 1808), it followed Domat by including, in addition to "smoke" and "nauseous smell", "the other different inconveniences which one neighbor may cause to another". Oeuvres complètes de J. Domat, Book 1, Title 12, Section 2, No. 10 (éd. Remy 1835). Article 665 of our 1825 Civil Code and Article 669 of our present Code omit "the other different inconveniences". The majority here

1. I was the author of the majority opinion in the Reymond case, but since I recognized then, and recognize now, that the discussion there of Article 669 was obiter dictum, I do not cite that case as authority.

has concluded because of this omission that the article must be confined to "smoke" and "nauseous smell", and that we cannot treat these as being merely illustrative of the inconveniences which man need not suffer. After finding the Code article to be so limiting of application, the majority proceeds to resort to the common law to circumvent this very restrictive meaning which it has accorded the codal article.

I reiterate that Article 669 does not establish a servitude, for it does not provide for a dominant and a servient estate, and in fact, contrary to the servitude law, even provides redress for those in the same house and upon the same estate against their neighbors. 1 Pt. 2 Planiol, Treatise on the Civil Law (La. State Law Institute tr. 1959) No. 2906. However, I find the article vital and most functional in expressing the activities of men upon property they own, hold, occupy, or use which become impermissible by causing insupportable inconvenience to neighbors.

The majority's error in holding Article 669 of the Code of 1870 not to be illustrative because of the omission of the pertinent phrase from it and from corresponding Article 665 of the Code of 1825 results from failure to examine the *French* text of Article 665 of the 1825 Code. While the

"other different inconveniences" is omitted from the English text of that article, the French text is the same as that of our 1808 Code, and contains the words: " * * * et les autre différentes incommodités qu'un voison peut causer à l'autre * * *." See 3 Pt. 1 Louisiana Legal Archives: Compiled Edition of the Civil Codes of Louisiana (1940), p. 385.[2] It was stated in Straus v. City of New Orleans, 166 La. 1035, 118 So. 125 (1928):

" * * * In fact the advantage of having access to both the French and English versions was pointed out in section 3 of chapter 29 of the Act of March 31, 1808, adopting the Digest [of the Civil Laws in Force in the Territory, referred to as the Civil Code of 1808], viz.:

" 'That if in any of the dispositions contained in the said digest there should be found any obscurity or ambiguity, fault or *omission,* both the English and French texts shall be consulted, and shall mutually serve to the interpretation of one and the other.'

"For the same purpose, it was provided in section 2 of the Act of April 12, 1824, p. 172, providing for the adoption and promulgation of the Code of 1825, that the English and the French version of each article should be printed opposite one another." (Emphasis mine.)

2. The Louisiana Legal Archives, of which the Compiled Edition of the Civil Codes of Louisiana is a part, is a most excellent but neglected library source. The Legislature, the Editorial Committee, and the Louisiana State Law Institute are deserving of deep gratitude from the legal profession in Louisiana for this work.

In Chretien v. Theard, 2 Mart.(N.S.) 582 (1824), it was said that the two texts of an article should be made to harmonize if possible, and that if one presented a more enlarged meaning or sense than the other, that version should be adopted, for in this way both texts could be given full effect.

We are required to hold that the 1825 Code, like the 1808 Code, included the "other different inconveniences" in the article. We need not inquire why the phrase was omitted from the English text in that Code, although the most obvious reason is that it was an error or oversight in translation. Reasonable men should agree that the 1870 Code, which is in English only, merely incorporated the English text of the 1825 article. The express language of the Legislature used in the Codes of 1808 and 1825 as well as our jurisprudence requires us, then, to find that "smoke" and "smell" as contained in the 1825 article were merely illustrative and that all other insufferable inconveniences were included; and that the 1870 text following the exact language of the English text of 1825 carries with it the same interpretation: That smoke and smell are merely illustrative and that we are required to exercise control over other inconveniences.

Moreover, our jurisprudence has established that our courts do have the power to protect neighbors from all insufferable inconveniences and not merely from those two named in Article 669, and the result reached by the majority holding here is the same. Among the many cases which have considered other inconveniences alleged to be insufferable to neighbors are Froelicher v. Oswald Ironworks, 111 La. 705, 35 So. 821 (1903) (noise, smoke, and odor); Froelicher v. Southern Marine Works, 118 La. 1077, 43 So. 882 (1907) (noise, steam, odors, vibrations); Perrin v. Crescent City Stockyard & Slaughterhouse Co., 119 La. 83, 43 So. 938 (1907) (noisome gases and vapors); Tucker v. Vicksburg, S. & P. Ry. Co., 125 La. 689, 51 So. 689 (1910) (soot, cinders, coal, and dust; air poisoned by gases; odors and vapors; noises including the screeching, rumbling, and bumping of the turntable); Orton v. Virginia Carolina Chemical Co., 142 La. 790, 77 So. 632 (1918) (pollution of a stream with poisonous acid and the air with poisonous gases); Dodd v. Glen Rose Gasoline Co., 194 La. 1, 193 So. 349 (1939) (flare burning waste gases and spreading heat, noise, sand, and impurities); McGee v. Yazoo & M. V. R. Co., 206 La. 121, 19 So.2d 21 (1944) (smoke, gases, soot, cinders); Devoke v. Yazoo & M. V. R. Co., 211 La. 729, 30 So.2d 816 (1947) (obnoxious smoke including gases, soot, and cinders). There are numerous other decisions from this court and the several Courts of Appeal which have considered many other by-products of men's activities for determining insufferable inconveniences to neighbors. Much of

the jurisprudence has cited common law without resort to the Civil Code, a few cases have cited Article 669, and some cases have cited no authority. It is clear that the jurisprudence has constantly and consistently included the "other different inconveniences" even though our present Code article does not contain that phrase.

There is no question, then, that the words "smoke" and "smell" in our present Code article must be interpreted as being illustrative of the "other different inconveniences which one neighbor may cause to another". In accord with the Chretien and Straus cases, this court should prefer the French text of the 1825 article as more enlarged and inclusive than the English text, and realize that it was the intent of the redactors to carry into the 1825 Code the 1808 article unchanged. An obvious error of omission in the English version of the 1825 article was perpetuated when this version was adopted into our 1870 Code. We should therefore, in the instant case, grant the plaintiffs the relief sought under our Civil Code Article 669 according to "the rules of the police" and "the customs of the place", and need not resort to common law concepts or to the common law terminology of nuisance per se and nuisance per accidens.[3]

I concur in the result.

Rehearing denied.

TATE, J., is of the opinion that a rehearing should be granted.

---

3. Even if my historical interpretation were unsound, which I do not concede, the majority would be in error here in resorting to common law to reach a result contrary to its determination of the intent of an express legislative provision. The Legislature has spoken through Article 669, and we as judges are required to interpret the legislative enactment *either* as being illustrative and hence requiring us to protect neighbors from all insufferable inconveniences *or* as being explicit and limiting and therefore forbidding us to interfere with inconveniences not there named. There is no gap in the legislative expression. While the majority opinion states that Article 669 is explicitly limiting and not illustrative, the actual effect of its opinion is to obviate its conclusion. I can find no support for such juridical methodology and technique in the civil law.