281 So.2d 764 (1973)
Frank T. SALTER, Jr., et al., Plaintiffs-Appellees,
v.
B. W. S. CORPORATION, INC., Defendant-Appellant.
No. 4181.
Court of Appeal of Louisiana, Third Circuit.
April 19, 1973.
Rehearing Denied May 8, 1973.
Writ Granted June 28, 1973.
*765 Lewis & Lewis by Seth Lewis, Jr., Opelousas, for defendant-appellant.
Joseph W. Greenwald, Lake Charles, for plaintiffs-appellees.
Before SAVOY, HOOD and MILLER, JJ.
MILLER, Judge.
Defendant B. W. S. Corporation, Inc. took a devolutive appeal[1] from the trial court judgment permanently enjoining defendant "... from disposing of any acids and/or chemicals on their property." Essentially defendant argues that its industrial waste disposal operations, by which it expects to serve the whole gulf coast petro-chemical and refining industry (Tr. 357), are safe and pose no harm to adjacent landowners and residents. We affirm.
BWS is in the business of disposing of industrial wastes including among other things acids, caustics, solvents, hydrocarbons, and various sludges. Before purchasing the 160 acre tract located some two miles northwest of DeQuincy, preliminary tests were conducted which indicated that the tract was suitable for BWS's purposes. On the basis of these tests BWS sought and was granted a permit from the Louisiana State Department of Health authorizing the implementation of disposal operations at the Calcasieu Parish site. The Department of Health relied on the tests and reports attached to the BWS application and made no effort to check the representations in the application.
Within two days after BWS began to truck barrels of various acids and chemical wastes onto its DeQuincy property, BWS was made defendant in this suit. A temporary restraining order prohibited BWS from proceeding to bury the barrels of waste then stored on its property. Photographs of the barrels showed escaping waste material. Parties plaintiff were the District Attorney, a Calcasieu Parish Police Juror and the DeQuincy Mayor. Two neighbors intervened, an adjacent landowner Ivey Vanwinkle and George Frazier, who described himself in his intervention as a lessee. The trial court sustained defendant's exception of no cause and no right of action as to the District Attorney, Police Juror and Mayor and there has been no appeal from that decision. An exception of no right of action was filed as to George Frazier's intervention contending that he was not a property owner or lessee, but this was subsequently waived by BWS. Following a two day trial and the issuance *766 of a temporary injunction, the parties stipulated that the court was to rule on the application for a permanent injunction and a permanent injunction was issued in favor of intervenors Frazier and Vanwinkle.
It was established that BWS planned to use substantially the entire 160 acre tract for landfill operations. They proposed to bury metal barrels containing substances, which were potentially lethal if ingested, in a series of trenches approximately 15 feet deep by 10 feet wide by 150 feet long. The barrels were to be covered by some eight feet of ground cover.
There were six water wells serving residents who live relatively close to defendant's property. Frazier's well was producing from a depth of 20-30 feet and was located some 500 feet east of defendant's property. Vanwinkle's water well is 189 feet deep and approximately 800 feet from the BWS excavation. Vanwinkle maintains a 12 foot deep water pond on his property. The pond has been and will be used by Vanwinkle to water cattle, but at trial it was used only as a fish pond.
The fall of the land was such that surface drainage was away from Vanwinkle's tract and not likely to reach Frazier's tract because a blacktop road with ditches separated the BWS and Frazier tracts. The subterranean flow of water was generally, though not uniformly described as following the surface flow.
The possibility of chemical and/or acid wastes permeating the soil and reaching aquifiers (sand strata which contain water deposits) which serve plaintiffs' wells and the water pond was the subject of great controversy among the witnesses. All expert witnesses agreed that for practical purposes clay is considered impermeable to liquids. BWS argues that because clay is present to a depth of 18 feet, it follows that disposal of the acids and chemicals is safe and augurs no harm to plaintiffs.
It was established that the pit area of the BWS tract was not composed solely of clay down to the 18 foot depth. Defendant's expert Dr. Boutwell testified that several sand layers were interspersed in the clay above the 18 foot level. Moreover water was found at 18 feet in one of Boutwell's borings on the BWS tract. In answer to a question by the trial judge, Dr. Boutwell stated that the water level could be greatly affected by the weather and that rain could raise the water level to 14-15 feet rather than let it remain at the 18 foot level. Because of the sand layers interspersed in the clay above the 18 foot level, Boutwell required as a precautionary measure that the pit be lined with three feet of tamped clay. BWS did not establish that it would follow this requirement. Although the Louisiana Department of Health indicated that its employees would routinely check the operation, it was not established that they required or would require BWS to line their disposal pit with clay.
At Tr. 270, Dr. Boutwell testified that it would be highly unlikely that the acids or chemicals could reach Frazier's well within one year but it would depend upon the sand in there. "Q. Sir, I ask you if Mr. Frazier and I invited you back after a year, would you drink out of that well? A. If he were doing it." Frazier is not required to expose his family to this risk.
Another important issue was the resultant chemical effect when various wastes come into contact with a representative sample of soil from the BWS tract. Defendant's expert testified that one barrel of clay would "effectively neutralize" one barrel of chemical waste with a pH in the acid range. The term neutralization denotes the chemical phenomenon whereby formerly active compounds become inert or inactive through chemical reactions. But this testimony presupposes that the buried acids and chemicals would be surrounded by clay, a fact not established to our satisfaction.
The State Health Officer Dr. Ranson K. Vidrine testified that when the State *767 Health Department issued the permit to BWS to operate its industrial waste disposal facility near DeQuincy, it was assumed that the containers in which the waste would be stored would adequately hold the material. After visiting the site at the time of trial and noting the corroded and deteriorated condition of the barrels, some of which were leaking, he testified that the waste material should be stored in barrels that would not corrode.
The August 24, 1972 permit expressly excluded disposal of bulk liquid wastes. A sanitary engineer for the Health Department testified that bulk liquids were liquids disposed of outside of containers. When asked to compare the disposal of liquid wastes in barrels which were susceptible of corrosion and deterioration by the stored contents, to the storage of bulk liquids, he stated that technically the barrels on the BWS tract were the same as handling bulk liquids.
The Louisiana State Board of Health has "... exclusive jurisdiction, control and authority over ... waste disposal within the state...." LSA-R.S. 40:11. But this does not override the provisions of LSA-C.C. Arts. 666-669.
LSA-C.C. Articles 666-669 apply to this case. Article 667 is dispositive of the issues here presented.
Article 667. Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
This Article has been the topic of a mild but quickening controversy. The controversy centers around the nature of the Code Article: whether it is a rule of property or a species of delictual liability.[2] The Article expresses the ancient doctrine: sic utere tuo ut alienum non laedas (so use your own so as not to injure another's property). Irrespective of the arguments over the nature and classification of the article, certain rules distilled from the various applications have evolved.
Article 667 imposes reciprocal servitudes or restraints upon neighboring properties which regulate or proscribe the making of a work which may damage a neighbor or deprive him of the enjoyment of his property. Robichaux v. Huppenbauer, 258 La. 139, 245 So.2d 385 (1971); Reymond v. State, Through the Department of Highways, 255 La. 425, 231 So.2d 375 (1970); Chaney v. Travelers Insurance Company, 259 La. 1, 249 So.2d 181 (1971). Although the stated proposition is generally agreed upon, difficulties arise over definitions of terms found in the code article.
In Chaney v. Travelers Insurance Company, 259 La. 1, 249 So.2d 181 (1971), the word "proprietor" was given a broad interpretation which included liability for the actions of the owner as distinguished from liability arising from works made upon the land, as well as liability for actions of the owner's agents, contractors, and representatives.[3]
Who is a "neighbor" in Article 667 is an issue which has not been defined directly by the jurisprudence. Most cases which have applied the article have had landowners as plaintiffs. We find that certain persons other than landowners have *768 the requisite interest necessary to entitle them to institute an action based on Article 667.[4]
Our interpretation of who may bring an action based on the sic utere servitude established by Art. 667 is buttressed by the nature of predial servitudes as defined in Art. 647 which defines a predial servitude as a "charge laid on an estate for the use and utility of another estate belonging to another owner."[5] LSA-C.C. Art. 646 states in part: "They are called predial or landed servitudes, because, being established for the benefit of an estate, they are rather due to the estate than to the owner personally."[6] Because the servitude is established for the benefit of the estate rather than for the owners personally, those who have a proprietary interest in the estate as outlined by Professor Stone have the standing to bring an action under Article 667.
Several Louisiana Supreme Court cases have allowed one other than a landowner to bring an action based on the sic utere or good neighbor servitude. In an early case, State ex rel. Violett v. King, 46 La.Ann. 78, 14 So. 423 (1894), the court discussed Civil Code Article 666 as a basis for granting injunctive relief to a tenant who occupied a house near a stable which was claimed to be a nuisance. The fact that plaintiff who perfected the injunction by giving bond does not own the premises which he occupies, but occupies it as a tenant, does not withdraw from him and his family the protection of the law against a nuisance affecting their health or their comfort. 14 So. at 426.[7]
In Robichaux v. Huppenbauer, 258 La. 139, 245 So.2d 385 (1971) the court accorded plaintiffs, two of whom were tenants, injunctive relief in a case with facts similar to those in the King case. In Borenstein v. Joseph Fein Caterers, Inc., 255 So.2d 800 (La.App. 4 Cir. 1972), the Court of Appeal granted an injunction to a plaintiff tenant based on LSA-C.C. Articles 666-669.
In this case BWS waived its exception of no right of action in which it was contended *769 that Frazier was neither a landowner nor a lessee of property in the vicinity of BWS's lands. Frazier admitted under cross examination that although he occupied the property for the past ten years, he had no lease. Nevertheless his actual legal status was not determined. We take note of our right to notice failure of a plaintiff to have a right or interest in a case. LSA-C.C.P. Art. 927. We also note that under LSA-C.C.P. Articles 644-646 we may remand a case so that the petition can be amended to join indispensable or necessary parties as plaintiffs. We deem it unnecessary to remand to allow the joinder of owners of the property on which Frazier lives, because (1) Frazier has a right of action and (2) Mr. Vanwinkle as owner of other property has asserted the same right and has established the possibility of damage to his fish and cattle watering pond.
Unlike remedies under the common law of nuisance or under the Louisiana hybrid law of nuisance, Robichaux, supra, the exercise of the sic utere servitude under LSA-C.C. Art. 667 does not depend on the subjective test of whether the owner or occupier of the dominant estate is in fact disturbed in the use and enjoyment of his land; nor does it depend upon proof of actual damages. The only requirement is an objective finding of probability that the owner or occupier of the dominant estate MAY at some time be deprived of enjoyment of his property or suffer damage because of the work made upon the servient estate.[8]
We find no manifest error in the trial court's determination that plaintiffs will suffer damage if defendant is allowed to dispose of noxious wastes on its property. Similarly there is no manifest error in the trial court's finding that a continuous sand stratum underlies and extends from Frazier's well to defendant's property. Although the probability of damage appeared more imminent to Frazier than to Vanwinkle, there is proof of a real danger of damage to Vanwinkle's property due to the works undertaken on defendant's property.
The issue of when one may apply for injunctive relief is touched on in State ex rel. Violett v. King, supra, quoting from Crescent City v. Police Jury, 32 La.Ann. 1192 at 1194 (1880).
"... it may be that the maintenance of the writ (of injunction) was required to preserve to us our homes and to establish us in a state or condition which lost for the moment can never be recovered, nor the loss atoned for by money. In this class of cases the injunction should be maintained, because the injury from its dissolution would be irreparable." 46 La.Ann. at 83. (Parenthetical addition ours.)
This is particularly appropriate to the plight of these plaintiffs.
The trial court was manifestly correct in its determination that plaintiffs need not wait until actual contamination of their water supplies before seeking a remedy. The exercise of the sic utere serviture of LSA-C.C. Art. 667 requires only a showing of a probability of damage. Establishment of such a probability is an issue of fact and the trial court's finding will not be disturbed absent manifest error. There was no manifest error.
Although we affirm the trial court's judgment permanently enjoining defendant from "disposing" of chemical wastes on its property, we note that the trial court judgment (approved as to form by plaintiffs' counsel) does not address the issue of the removal of those wastes already on defendant's property. Since plaintiffs did not appeal nor answer defendant's appeal, the issue is foreclosed to this court.
*770 We note that on October 25, 1972 (six days after the judgment was rendered), the State Department of Health issued an order to BWS "... to bury the materials presently on the site in accordance with the proposals previously submitted by your Corporation to and approved by this office." Compliance with that order would conflict with the properly issued injunction. It is unfortunate that plaintiffs are not seeking to have the industrial waste removed.
The trial court judgment is affirmed at defendant's cost.
Affirmed.
NOTES
[1] The trial court refused defendant's motion for a suspensive appeal.
[2] Reymond v. State, Through Department of Highways, 255 La. 425, 231 So.2d 375 (1970); Chaney v. Travelers Insurance Company, 259 La. 1, 249 So.2d 181 (1971); The Work of the Louisiana Appellate Courts 1969-1970Torts, 31 La.L.Rev. 231 (1971); The Work of the Louisiana Appellate Courts 1969-1970Property, 31 La.L.Rev. 196, 217; The Work of the Louisiana Appellate Courts, 1969-1970Mineral Rights, 31 La.L. Rev. 263, 282; The Work of the Louisiana Appellate Courts, 1970-1971Property, 32 La.L.Rev. 172, 183.
[3] The Work of the Louisiana Appellate Courts 1970-1971Property, 32 La.L. Rev. 172, 186. Professor Yiannopoulas suggests that the word "proprietor" could include in addition to owners: usufructuaries, lessees, and possessors in good or bad faith.
[4] See 40 Tul.L.Rev. 701, 711-712, where Professor Stone wrote with respect to a delineation of those who should be classified as "neighbors" in Art. 667.
[5] See language which suggests a contrary result in The Work of Louisiana Appellate Courts 1969-1970Property, 31 La.L.Rev. 196, 221-222.
[6] The solution to the problem of who may sue as plaintiff under Article 667 may well be dependent upon the classification of the action, and whether the law of France with respect to the classification of servitude actions has been incorporated into the Louisiana Law. Whereas LSA-C.C. Art. 667 has no specific counterpart in the Code Napoleon, other negative servitudes exist in the Code Napoleon which are similar in nature. 1 Planiol, Civil Law Treatise no. 2909 (La.St.L.Inst.transl.1959). An action in complainte (possessory action) will lie in the case of trouble affecting continuous, apparent servitudes in France. Planiol, supra, no. 2973; 2 Aubry & Rau, Droit Civil Francais § 185. "Persons, such as a simple lessee or a tenant farmer, who hold for the account of another and have in their own name only a personal right of enjoyment, do not have a standing to bring a complaint." Aubry & Rau, supra, § 129.

In Louisiana, as in France, a predial lessee is considered as possessing for his lessor, and accordingly, may not bring the possessory action. LSA-C.C.P. Arts. 3655, 3656; 1 Yiannopoulas, Louisiana PracticeCivil Law of Property § 138. An early Louisiana Supreme Court case classified an action based on servitude as a possessory action. Burke v. Wall, 29 La.Ann. 38 (1877). The court cited Code of Practice Articles 46 and 47 as authority. Although the provision for possessory actions under the Code of Civil Procedure refers to C.P. Art. 46 for comparison, its source is listed as new. Moreover Burke has not been followed as authority for the proposition that an action based on servitude is a possessory action. Professor Yiannopoulas designates actions on servitudes as innominate actions. Yiannopoulas, supra, § 141.
[7] But see Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133, 139 (footnote 12) (1971).
[8] See dissent in Hilliard v. Shuff, 260 La. 384, 256 So.2d 127, 130 (1972); Work of the Supreme Court, 1949-1950Property, 11 La.L.Rev. 178, 179.