459 So.2d 1345 (1984)
VIENNA BEND SUBDIVISION HOMEOWNERS ASSOCIATION, et al., Plaintiffs-Appellees,
v.
Linda Simpson Prudhomme MANNING and The Natchitoches Association for Retarded Citizens, Inc., Defendants-Appellants.
No. 83-1075.
Court of Appeal of Louisiana, Third Circuit.
December 12, 1984.
*1346 Harrington & Harrington, C. Rodney Harrington, Natchitoches, for plaintiffs-appellees.
James E. Beal, Natchitoches, for defendant-appellant.
Andrew Vallien, Natchitoches, for plaintiff-appellee-appellant.
Lunn, Irion, Johnson, Salley & Carlisle, Martin Trichel, Shreveport, for defendants-appellees.
Before DOMENGEAUX, GUIDRY and KNOLL, JJ.
GUIDRY, Judge.
The Vienna Bend Subdivision Homeowners Association, an unincorporated association, filed this action on July 1, 1983 against Linda Simpson Prudhomme Manning and the Natchitoches Association for Retarded Citizens, Inc. (NARC) seeking to enjoin them from entering into a lease of certain property owned by Manning in the Vienna Bend Subdivision in Natchitoches, Louisiana. Plaintiff claims that such lease would be in violation of the duly recorded restrictive covenants of the Vienna Bend Subdivision. A temporary restraining order was issued on July 1, 1983, enjoining Manning from leasing the disputed property to NARC for the purpose of housing five mentally retarded citizens.
NARC answered by a general denial, although admitting the fact that Manning had already leased the property to NARC on May 19, 1983, and that the leased residence was to be used as a "community home" within the definition of La.R.S. 28:381(8) as amended by Act 538 of 1982. NARC further asserted that the TRO should not have issued since no bond was posted by the plaintiff as required by La.C. C.P. Art. 3603, and for the further reason that there had been no showing of irreparable injury by the plaintiff.
On July 13, 1983, NARC filed a motion to dissolve the TRO and sought damages for *1347 the wrongful issuance of such order. NARC also filed an exception of no right of action, asserting that the Vienna Bend Subdivision Homeowners Association had no capacity to sue to enforce the rights of its individual members.
Plaintiff thereafter amended its original petition to add Benny O'Brien and Joni Adams, individual property owners in the Vienna Bend Subdivision, as plaintiffs. The trial judge signed an order on July 18, 1983 issuing a new TRO to prevent the intended use of the leased premises by NARC. Bond was set at $5,000.00 but was never posted by the plaintiffs due to the notation on the trial judge's order that bond is to be posted "provided that after the hearing set for July 19th that it is necessary to post bond."
Defendants' motion and exception were referred to the hearing on the rule for a preliminary injunction which was heard on July 19, 1983. At the conclusion of the evidence, judgment was rendered in favor of plaintiffs. In his oral reasons for judgment, the trial judge made the following findings:
(1) the community home was not a single family dwelling as is required by the subdivision's restrictive covenants;
(2) the community home was a commercial venture;
(3) the operation of the community home would create the possibility of an annoyance and/or nuisance, thereby resulting in irreparable injury to the plaintiffs; and,
(4) neither of the parties were entitled to damages.
In accord with these findings, the trial court rendered judgment denying defendant's motion to dissolve the TRO and for damages and also defendant's exception of no right of action. Further, the aforementioned judgment ordered that a preliminary injunction issue, prohibiting Manning from leasing the disputed property to NARC or to anyone else in violation of the Vienna Bend Subdivision restrictions, and enjoined NARC from leasing the Manning property, or any other property in the Vienna Bend Subdivision, for the purpose of housing retarded citizens, and further restraining and enjoining defendants from operating the aforementioned property as a "home" or facility for retarded persons, employees, or any other representatives or persons under the control of or responsibility of NARC from occupying or using the property in any way in contravention of the subdivision restrictions. Defendants were given 60 days in which to remove the individuals who were residing in the home at the time of the hearing. The judgment was signed on August 16, 1983.
Defendants thereafter applied for a writ of certiorari to our court, which was denied on August 26, 1983. (Case No. 83-782). Defendants then applied for a writ of certiorari to the Supreme Court of Louisiana (No. 83-CC-1981), which was granted on September 23, 1983, ordering the trial judge to grant a suspensive appeal. 437 So.2d 1157. In obedience to the latter order, this suspensive appeal followed.

FACTS
Defendant Manning is the owner of Lot 23, Unit 4, and the residence thereon, of the Vienna Bend Subdivision in Natchitoches, Louisiana. On May 19, 1983, Manning leased her property in Vienna Bend to NARC, a Louisiana Non-Profit Corporation, for a monthly rental of $1,000.00. NARC's purpose in leasing the property is to operate a "community home" for five mentally retarded adults and two live-in houseparents, pursuant to La.R.S. 28:381(8), as amended by Act 538 of 1982. NARC contracted with the Office of Family Services of the Louisiana Department of Health and Human Resources to provide this particular home. The community home is to be used solely as a residence. The residents go to NARC's Work Activity Center during the day, which center is located out of the Vienna Bend Subdivision. The community home is designed as the permanent or semi-permanent home for the retarded individuals living therein. The five residents and the two houseparents are to share the household duties and responsibilities within their individual abilities. *1348 The houseparents assist the residents in the day to day problems of community living. The occupants of the home function together as a single household unit.

RESIDENTIAL-SINGLE FAMILY DWELLING
Plaintiffs' objections to the defendants' intended use of the property is that such use violates certain provisions of the Vienna Bend subdivision restrictive covenants, in particular the following provision:
"II. RESIDENTIAL AREA COVENANTS
A. LAND USE AND BUILDING TYPE
No lot shall be used except for residential purposes. No building shall be erected, altered, placed, or permitted to remain on any lot other than one detached single family dwelling and a private garage for not more than three cars...."
The law concerning building restrictions is found in La.C.C. Arts. 775 through 783. Article 775 requires that building restrictions be part of a general plan that is feasible and capable of being preserved. Article 783 provides that when there is doubt as to the existence, validity, or extent of building restrictions, resolution must be made in favor of the unrestricted use of the property. The major issue of this appeal is whether the operation by NARC of a community home on Lot 3, Unit 4 is proscribed by the above quoted restrictive covenant.
The plaintiffs contended, and the trial judge agreed, that the proposed community home did not fit into the restrictive requirements of being either residential or a "single family dwelling". In its reasons for judgment granting the preliminary injunction, the trial court stated:
"... To have a couple designated as houseparents with six mentally retarded citizens in my opinion is not a single family. It represents a dormitory-type building, which the Court considers to be more of a commercial venture rather than a private home as intended by the restricted (sic) covenants of the Vienna Bend Covenants."
In Gwatney v. Miller, 371 So.2d 1355 (La.App. 3rd Cir.1979), we quoted the following from the Supreme Court in Salerno v. Delucca, 211 La. 659, 30 So.2d 678 (La. 1947), concerning the interpretation of restrictive covenants:
"Although these stipulations are stricti juris and every doubt should be resolved in favor of the unencumbered use of the property, whenever differences arise as to the extent or limitation of these restrictions, we must look to the intention of the party encumbering the property from the words used in the stipulations in the deed, consideration being given to the entire context of the instrument rather than to a single phrase or clause, for obviously those acquiring the property in the restricted area were motivated and influenced to purchase the same because of these limitations and they are entitled to the presumption that they will be fairly and faithfully complied with." [30 So.2d] at pp. 679-80.

The first sentence of the building restriction in question states that, "No lot shall be used except for residential purposes." This restriction refers to the allowed use of the property. There is no evidence in the record which shows that the community home would be used except as a residence. The evidence is clear that the home would be used solely to house five mentally retarded adults and two houseparents, and that their training and work activities would take place at locations outside of the Vienna Bend Subdivision. The mentally retarded individuals would have certain household duties and responsibilities and would function together as a single housekeeping unit.
The trial court, in its reasons for judgment, seemed to place much emphasis on the phrase "single family", stressing the fact that the retarded individuals would be coming from different origins and families. Viewing the restrictive covenant as a whole, the requirement of "one detached *1349 single family dwelling and a private garage for not more than three cars" refers to the specific structure on the lot as opposed to the actual make-up of the individuals therein. The evidence is clear that the only residential building on the property is a single family structure.
In our view, NARC's community home clearly complies with this Vienna Bend subdivision restrictive covenant since the home will be used for "residential purposes" only. We find support for our conclusion in La.R.S. 28:381(8), as amended by Act 538 in 1982, which states that:
""Community home" means residential living options that are certified, licensed, or monitored by the department to provide residential services to fifteen or fewer mentally retarded individuals. Community homes that provide for six or fewer mentally retarded individuals, with no more than two live-in staff, shall be considered single family units having common interests, goals, and problems. A community home that provides residential living options for seven to fifteen mentally retarded individuals shall be referred to as a group home." (Emphasis ours)
This statute clearly indicates that the legislature specifically intended the community home in question to be considered a single family unit. We thus find that NARC's community home is clearly sanctioned by the Vienna Bend subdivision restrictive covenant II A.
The case of City of West Monroe v. Ouachita Association for Retarded Children, Inc., 402 So.2d 259 (La.App. 2d Cir. 1981), supports our holding. In the Ouachita case, the City of West Monroe filed suit seeking a judgment declaring that the defendant's proposed use of the property violated the city zoning ordinance. The property in question was located in an R-1 district, which is the designation for one-family residences. The defendant sought to operate a home for six mentally retarded adults and two live-in houseparents, similar to the home which NARC plans to operate. The district court held that the defendant's proposed use of the residential property was a special exception use which had to be approved by the City Planning Commission and by the Board of Adjustment because the home did not constitute use as a one-family dwelling. Thus, the injunction prayed for was granted. The Second Circuit Court of Appeal reversed and found that the proposed use was a use of right under the provisions of the zoning ordinance. In arriving at its decision, the court cited various statutes from Louisiana's mental retardation laws, La.R.S. 28:380 et seq. La.R.S. 28:390, as amended by Act 538 of 1982, provides in part as follows:
"B. Every individual who is mentally retarded shall have the following rights unless restricted by law:
(1) To live in the least restrictive residential living option appropriate to his individual needs and abilities, including the right to live in a variety of living situations, such as the right to live in home, in substitute family care, in supervised apartments, in community homes, or residential facilities.
(2) To receive appropriate residential living options or mental retardation services or both suited to each individual's needs in order to maximize his capabilities and to enhance his ability to cope with his environment."
The sole issue in the Ouachita case was whether, under the zoning ordinance, the defendant's proposed use was a permitted use in an R-1, one-family residential district. The zoning ordinance defined "family" as one or more persons living together as a single housekeeping unit which may include not more than four lodgers or boarders. The appellate court stated, "... we find that the proposed use by the association falls squarely within the plain and unambiguous language of the ordinance defining one-family dwelling residential use."
In reaching its decision, our learned brothers of the Second Circuit reasoned as follows:
"The occupants of the group home do not meet the definitions of lodger or boarder, nor does the group home constitute a boarding house or rooming house. *1350 Although the residents will eat and sleep in the home, they cannot be deemed to be an unrelated group of people occupying only a part or a portion of another's house. The mentally retarded adults have common interests, common goals, common problems, and will be receiving some supervisory attention from the houseparent couple who will also reside in the home. They will not be mere lodgers or boarders, especially in the commercial context in which the terms are used in the ordinance. Rather, the persons residing in the group home constitute a single housekeeping unit composed of persons who are living and working together toward common goals and who will, as nearly as possible, emulate the lifestyle of the traditional family as we know it.
In defining one-family dwelling and family, the ordinance does not place any numerical restriction on the number of persons living together as a single housekeeping unit, nor does it require any relationship between the persons, biological or otherwise. The ordinance does limit the number of boarders or lodgers who may be accommodated in a one-family residence but as previously held that situation does not exist here."
The court then cited a number of cases from other states which similarly have held such homes to be single family dwellings. The court concluded as follows:
"The decisions in the cases cited above relied on the well-organized principle that zoning ordinances are to be strictly construed in favor of the use proposed by the owner, which principle also forms an important basis for our decision in this case. The persons who will occupy the association's group home will be living together as a single housekeeping unit; therefore, the proposed use of the property is a use by right under the zoning ordinance of the City of West Monroe and, as such, does not require the approval of the city planning commission or the board of adjustment."
Although the Ouachita case dealt with a zoning ordinance as opposed to a subdivision restriction, the same principles of law are applicable. Both are restrictions on the free use of property and, as such, any conflicts in interpretation should be resolved in favor of the unrestricted use of the immovable. In view of the legislative definition of "community home" as set forth in La.R.S. 23:381 and the reasoning of the Ouachita case, we hold that the use of the property in question as a community home is not in violation of the Vienna Bend restrictive covenant II A, and the trial court clearly erred in holding to the contrary. Further support for our holding in this regard is found in the case of Tucker v. Special Children's Foundation, Inc., 449 So.2d 45 (La.App. 1st Cir.1984), writ denied, 450 So.2d 959 (La.1984); and, Harbour v. Normal Life of Louisiana, Inc., 454 So.2d 1208 (La.App. 3rd Cir.1984).

COMMERCIAL VENTURE
The trial court held that the operation of the community home by NARC was a commercial venture and thus violated the restrictive covenant which allowed use of the property only for residential purposes. The trial judge based his decision that the community home was a commercial venture on the fact that the Office of Family Security paid rent of $1,000.00 per month to Mrs. Manning and $1,800.00 per month to the houseparents as their salary for caring for the mentally retarded residents of the home.
We do not agree with the trial judge that simply because the Office of Family Security paid the rent and the houseparents' salaries that the community home should be classified as a commercial venture. As we previously mentioned, NARC is a non-profit corporation. Its sole purpose in establishing the community home is to provide a home for certain mentally retarded individuals who have no family to care for them, but who are not in need of constant care and attention. The houseparents are staff personnel whose function is similar to that of any live-in cook, housekeeper, or nurse whom anyone in the subdivision might hire to help perform certain household functions which are difficult or *1351 inconvenient. For these reasons, and those set forth in our previous discussion as to the residential character of NARC's endeavor, we conclude that the trial court erred in classifying NARC's intended use of the Manning property as commercial.

NUISANCE
The trial court found that the operation of the community home by NARC created the possibility of an annoyance or nuisance to the other residents of the subdivision. It thus concluded that the intended activity constituted a nuisance, in violation of restrictive covenant II G, which states in pertinent part:
"No obnoxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood."
Our Supreme Court in Robichaux v. Huppenbauer, 258 La. 139, 245 So.2d 385 (1971), examined the two types of nuisances recognized in Louisiana as follows:
"Nuisances by their nature are nuisances per se or at law, and nuisances per accidens or in fact. A nuisance at law or a nuisance per se is an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings. Nuisances in fact or per accidens are those which become nuisances by reason of circumstances or surroundings.
In the case of a nuisance per se, the thing becomes a nuisance as a matter of law. Its existence need only be proved in any locality and the right to relief is established by averment and proof of the mere fact. But whether a thing not a nuisance per se is a nuisance per accidens or in fact depends upon its location and surroundings, the manner of its conduct, or other circumstances. In such cases, proof of the act and its consequences is necessary. Borgnemouth Realty Co. v. Gulf Soap Corporation, 212 La. 57, 31 So.2d 488 (1947). See also 39 Am.Jur., Nuisances, § 11; 66 C.J.S. Nuisances § 3."
Under the above definition, the operation of a community home for mentally retarded individuals can hardly be deemed a nuisance per se or at law. A community home for mentally retarded individuals is specifically authorized by the legislature. La.R.S. 28:380 et seq. It therefore was the plaintiffs burden to prove by a preponderance of the evidence that the community home was a nuisance per accidens or in fact. We find that plaintiffs failed to meet this burden. The record is void of any evidence supporting the conclusion that the operation of the community home would create a nuisance to the neighborhood. The only evidence adduced at the hearing was the unfounded fears of some of the residents of the Vienna Bend subdivision. The neighbors who testified at the hearing expressed their concern for the safety of their wives and children. They stated that they felt the quality of their lives would be severely damaged if the mentally retarded adults were allowed to move into their neighborhood. Not a single incident was complained of by any of the neighbors which could lead a court to conclude that the home created a nuisance.
La.R.S. 28:390(A), as amended by Act 538 of 1982, states that:
"A. Every individual who is mentally retarded in this state shall have the rights, benefits, and privileges guaranteed by the constitution and laws of the United States and the constitution and laws of the state of Louisiana. Every recipient shall enjoy the same rights as other citizens of the United States and Louisiana except when restricted by law. The rights of individuals who are mentally retarded which are specifically enumerated in this Chapter are in addition to all other rights enjoyed by all other citizens, and such listing of rights is neither exclusive or intended to infringe upon any rights which are guaranteed to the mentally retarded under the laws and constitutions of the United States and the state of Louisiana."
La.R.S. 28:393(A), as amended by Act 538 of 1982, states:

*1352 "A. It is recognized that mental retardation does not in and of itself pose a threat to the safety and security of a community or the individual and as such does not preclude the individual who is mentally retarded from the benefits, rights, and duties of other members of the community."
In light of the above legislative enactments, to hold that these individuals create a nuisance to the neighborhood simply because they are mentally retarded, would constitute a clear violation of these laws created specifically for the purpose of protecting mentally retarded citizens.
At the time of the hearing, there was only one mentally retarded resident living in the community home, along with the two live-in houseparents. Mrs. Karen Apponey, who lives next door to the Manning home, stated at the hearing that the mentally retarded resident always remained inside of the home. She testified that the houseparents never left the house without taking him along with them. Mrs. Apponey even observed that, due to the periodic yardwork which one of the houseparents performed, the outward appearance of the Manning home had improved since the community home commenced operation. We find that the trial court erred in its holding that the community home created the possibility of an annoyance or nuisance to the neighborhood. There was no evidence presented at the hearing to substantiate this finding.

IRREPARABLE INJURY
For the reasons heretofore stated, we determine that there has been no violation by defendants of the restrictive covenants of the Vienna Bend Subdivision. Therefore, we need not consider defendants' alternative argument that the preliminary injunction should not have issued because of plaintiffs' failure to demonstrate irreparable injury, loss or damage. In passing, however, we observe that building restrictions may be enforced by mandatory and/or prohibitory injunctions without the necessity of a showing of irreparable injury. La.C.C. Art. 779.

DAMAGES AND ATTORNEY'S FEES
Defendants urge that the trial court erred in denying their demand for damages for the wrongful issuance of the temporary restraining order and preliminary injunction. La.C.C.P. Art. 3608 states that:
"The court may allow damages for the wrongful issuance of a temporary restraining order or preliminary injunction on a motion to dissolve or on a reconventional demand. Attorney's fees for the services rendered in connection with the dissolution of a restraining order or preliminary injunction may be included as an element of damages whether the restraining order or preliminary injunction is dissolved on motion or after trial on the merits."
The trial court denied defendants' motion to dissolve the temporary restraining order and, after summary proceedings, ordered the issuance of a preliminary injunction.
At the outset, we observe that the defendants have not thus far sought, by motion or reconventional demand, damages for dissolution of the preliminary injunction and, therefore, it cannot be said that the trial court erred in failing to award damages for wrongful issuance of the preliminary injunction as that issue was never before it. Likewise, such issue is not before this court on appeal.
Defendants' contention that the trial court erred in issuing the temporary restraining order and likewise erred in refusing to award damages for its wrongful issuance cannot be considered by this court on appeal. In Budd Construction Company, Inc., et al v. City of Alexandria et al, 401 So.2d 1070 (La.App. 3rd Cir.1981), writ denied, 404 So.2d 1262 (La.1981), we held that an appellate court has no power to consider on appeal the propriety of a trial court judgment refusing to dissolve a TRO. La.C.C.P. Art. 3612. We adhere to that view for the reasons stated in Budd, supra.
For the above and foregoing reasons, the judgment appealed from insofar as it ordered the issuance of a preliminary injunction directed to defendants is reversed *1353 and set aside and the preliminary injunction is ordered dissolved. This matter is remanded to the trial court for trial on its merits not inconsistent with the views expressed herein.[1] Plaintiffs-appellees are assessed with all costs of this appeal, with costs at the trial level to await a final disposition of this matter.
REVERSED AND REMANDED.
NOTES
[1] Unless the parties expressly agree to submit a case for final decision at the hearing on the rule for preliminary injunction, the principal demand for a permanent injunction is determined only after a full trial under ordinary process, even though the summary hearing on the rule for a preliminary injunction may tentatively decide merit/issues. Haughton Elevator Division v. State, 367 So.2d 1161 (La.1979); and, Equitable Petroleum Corp. v. Central Transmission, Inc., 431 So.2d 1084 (La.App. 2d Cir.1983).