529 So.2d 374 (1988)
George J. BUTLER, George J. Butler, Inc. and Leo Bianchini
v.
Winston C. BABER d/b/a Progress Petroleum Company, Highlands Insurance Company, Robert P. Waldron, Inc. and Robert P. Waldron.
No. 87-C-2121.
Supreme Court of Louisiana.
May 23, 1988.
Rehearing Denied September 8, 1988.
*375 Alvin LeBlanc, Jr., DeMartini, LeBlanc, D'Aquila & Volk, Kenner, for applicant.
J. Walter Ward, Jr., Christovich & Kearney, Jesse Guillot, New Orleans, for respondent.
Michael Osborne, Christopher Gobert, Osborne & McComiskey, Oliver A. Houck, Tulane Law School, New Orleans, amicus curiae for the Organization of Louisiana Fishermen.
DIXON, Chief Justice.
This case involves a claim for damage to oysters and water bottoms as a result of the dredging of a canal for use in drilling an oil well. Plaintiffs,[1] George Butler, George Butler, Inc. and Leo Bianchini, are holders of oyster leases in Wilkinson Bay. Defendant Winston Baber d/b/a Progress Petroleum Company, insured by Highlands Insurance Company, dredged a canal through Wilkinson Canal, part of Bayou Dupont, and the marsh into Wilkinson Bay in Plaquemines Parish. Also named as defendants were Robert Waldron, Robert Waldron, Inc., the consultant hired by Baber to select routes for the canal, Southern Louisiana Contractors, Inc., the dredger, and J. Ray McDermott and Company, Inc., hired to backfill and dam the canal. Southern Louisiana Contractors and McDermott later settled with the plaintiffs and were dismissed along with their third party demands.
The trial court rendered judgment in favor of the defendants. The court of appeal affirmed with one dissent. Butler v. Baber, 512 So.2d 653 (La.App. 4th Cir.1987). We reverse.

FACTS
The district judge concluded that the plaintiffs failed to carry their burden of proof that the defendants' activities, incident to their mineral lease, were conducted negligently and without reasonable skill and proper precautions in disregard of plaintiffs' rights under their oyster leases. The court of appeal in its opinion reviewed the facts and expert testimony in great detail, but found the plaintiffs' evidence insufficient to support their cause of action or to prove that the defendants acted negligently.
Plaintiffs argue that they carried their burden establishing that the defendants owed a duty which they breached, and caused the damages suffered by plaintiffs. Plaintiffs also argue that defendants should be held strictly liable under C.C. 667. Defendants allege that other factors, including fresh water intrusion and eroding coast lines, contributed to the silt overburden in Wilkinson Bay and the blackening and mortality of the oysters in the leases in Wilkinson Bay. Defendants argue that plaintiffs did not prove that they acted negligently in dredging the canal, and that C.C. 667 is not applicable.
The trial took place intermittently over three years time, producing thirteen volumes of testimony. We find ample evidence, produced by both sides, to establish plaintiffs' claims. There was testimony by experts for both parties, including Robert Waldron, a defendant, that the oyster leases involved in this case were producing oysters in paying quantities prior to the dredging operation, and the water bottoms were firm to hard and suitable for oyster production. Although there was testimony that the salinity levels in Wilkinson Bay were sometimes on the low end of the scale for oyster production, there was also testimony that the lower salinities made the oysters less susceptible to predators, positive factors for natural oyster reproduction.
*376 Baber wanted to drill an oil well in Wilkinson Bay, and because the water in the Bay was only four or five feet deep, he decided to dredge an access canal through the marsh from Wilkinson Canal and Bayou Dupont to the west side of Wilkinson Bay, in order to move the drilling rig and equipment into Wilkinson Bay. Baber hired Waldron, a consulting geologist, to select possible routes for the canal. Waldron proposed three possible routes; Baber chose the one to be executed.
Ultimately the route was changed to avoid damaging an area where plaintiffs had seeded oysters, and when Baber applied for a dredging permit, the United States Corps of Engineers required that the well location be placed northeast of the originally selected site so that it would be farther from plaintiffs' oyster planting. When the canal was actually surveyed, staked and dredged, it again was moved slightly.
Baber paid plaintiffs for a right of way, and the canal was dredged through the marsh, ponds and bayous west of Wilkinson Bay. The canal was to be seventy feet wide with spoil placed on either side of the channel. Southern Louisiana Contractors used a small dredge, first dredging a narrow channel through the marsh from Bayou Dupont, opening into Wilkinson Bay and then widening the canal as the dredge moved back toward Bayou Dupont. The canal remained open for six months, from May to October, 1978.
The well was dry, and J. Ray McDermott and Company was hired to plug the canal. McDermott removed the spoil bank which extended into Wilkinson Bay from the Bay's western shore. McDermott also plugged both ends of the canal, at its Wilkinson Bay end and at its beginning in Bayou Dupont.
Witnesses testified that the plug on the Wilkinson Bay end of the canal has eroded, allowing boats to enter the canal from the Bay. The western plug, at the Bayou Dupont end, is intact but has a cut in the top over which boats or animals have crossed and is partially submerged at high tides.
When plaintiffs' employees returned in August, 1978 to dredge for oysters in Wilkinson Bay after the canal had been opened, they found blackened oysters which were dead or dying and an overburden of mud on the oyster reefs and beds. When the Wildlife and Fisheries investigators and the other expert witnesses inspected the area, they found increased oyster mortality and a soft, fluffy, organic silt covering the bottoms in varying thicknesses. Other sources of this silt were suggested by defendants' witnesses, including Waldron, who, although a defendant, was accepted as an expert witness. However, Wildlife and Fisheries personnel and independent experts, including Charles Dugas of Wildlife and Fisheries, who was a defense witness, testified that the most likely source was the dredging of the canal. The witnesses found that several inches of mud covered the oyster beds and blackened and suffocated the oysters.
Waldron's testimony, which lasted several days and covered a wide range, was inconclusive. He testified that he designed the canal to include angulations which he thought would decrease the current through the canal from Wilkinson Canal and Bayou Dupont. Even his testimony, however, showed that there was increased mud and increased oyster mortalities after the dredging. His testimony also verified that there had been significant oyster production in Wilkinson Bay as far back as 1959 (when Waldron inspected the area while working from Wildlife and Fisheries for a year) and as recently as just before the dredging.
Expert witnesses suggested three sources to account for the amount of sediment which was washed into the Bay: (1) the sediment naturally moving down the system; (2) the sediment that washed from the dredging material along the bank of the canal; (3) the sediment coming out of the ponds through which the canal was dredged.
Both the defendants' mineral lease and the plaintiffs' oyster leases were obtained from the State of Louisiana.
*377 Plaintiffs suggest two theories of recovery: (1) negligence under C.C. 2315 and (2) strict liability under C.C. 667. After reviewing the testimony, the court of appeal found evidence to suggest that the defendants' dredging operation "may have been a cause in fact of damage to the oysters and oyster bottoms." However, the court of appeal held that this "cause in fact" evidence was not sufficient since "plaintiff's bore the burden of proving defendants conducted the operation negligently or without reasonable prudence and proper precaution." The court of appeal held that plaintiffs failed to show a lack of prudence or precaution on defendants' part. The court found that the evidence established that the defendants "carefully surveyed the entire project, considered alternative routes for the canal, selected the route thought to pose the least risk of damage and thereafter performed the project." According to the court of appeal there was no showing that defendants "displayed less than ordinary skill, care, and expertise, or utilized unreasonable or imprudent procedures." For these reasons, the court of appeal denied recovery under C.C. 2315.
Regarding recovery under C.C. 667, the court of appeal found it questionable whether plaintiffs and defendants, as co-lessees of the same property, should be considered "proprietors" under the language of article 667, and held that plaintiffs and defendants cannot properly be considered "neighbors" so as to render C.C. 667 applicable. For this reason, the court of appeal denied recovery under this theory as well.
It is our conclusion that the plaintiffs prevail under C.C. 667.
Civil Code article 667 establishes an obligation of vicinage, a limitation on the use of property. Article 667[2] reads as follows:
"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
The development of C.C. 667 in this court indicates a trend in the direction of a broader interpretation of the language of the article. Prior to the translation of the French commentators by the Louisiana Law Institute and the subsequent commitment to the interpretation of the Civil Code without reference to common law doctrine, article 667 was interpreted in terms of common law nuisance, and distinctions were made between nuisance per se and nuisance in fact. Since the early 1970's, the direction has been to move away from nuisance theory.
In 1971 three cases dealing with C.C. 667 were considered by this court. Robichaux v. Huppenbauer, 258 La. 139, 245 So.2d 385 (1971), involved the operation of a horse stable within a residential area of the City of New Orleans which was found to be not a nuisance per se but a nuisance in fact. Plaintiffs relied on C.C. 669 to support their claims. Although 667 and its companion articles 668-669 were referred to in the opinion, the court found the Civil Code articles did not deal explicitly with the standards to be followed and chose, therefore, to use these articles "together with the common law theory of nuisance to grant relief where a use of property causes inconvenience to a neighbor." Robichaux v. Huppenbauer, supra at 389. The court held that noxious smells, rats, flies and noise may be actionable nuisance although produced and carried on by a lawful business, where they result in material injury to neighboring property or interfere with its comfortable use and enjoyment by persons of ordinary sensibilities. The court remanded for a determination as to whether it was possible to maintain the stable free of complaints. Justice Barham concurred. *378 but was of the opinion that the result should have been reached solely by application of the civil law, more particularly article 669, without resort to common law authority or terminology. Barham felt that the language of 669 should be read as illustrative.
In Chaney v. Travelers Insurance Co., 259 La. 1, 249 So.2d 181 (1971), article 667 was found to be applicable to damage from construction incident to canal improvement by the parish. The adjoining property owner suffered cracks in the walls and ceilings of his home from the vibrations created by the use of heavy equipment within ten feet of the house. The court found that "work" includes "activity" as well as "structure," even though the proprietor's actions are prudent by usual standards. The majority also found the agents of the proprietor, such as contractors and representatives, are solidarily liable with the proprietor if his activity causes damage to a neighbor.
Hilliard v. Shuff, 260 La. 384, 256 So.2d 127 (1971), the third case in 1971, dealt with four above ground fuel tanks on the property of a truck stop owner. The court found that when storage of fuels creates a substantial hazard, then use of the property runs counter to C.C. 667-669. There, 58,800 gallons of gasoline and diesel were found to prevent plaintiff from safely operating an auto, truck, tractor, or power mower within fifty feet of the fuel tanks. Since this threatened the physical security of plaintiff's family, it was held to be an enjoinable nuisance. The court remanded the case for evidence as to methods of correction.
Justice Barham would have granted a permanent injunction applying article 667 alone, because danger of fire and explosion is not a mere inconvenience under C.C. 668-669, but rather gave plaintiff a right under C.C. 667.
In 1973 the court rendered judgment in a case involving seventeen suits by one hundred nineteen plaintiffs claiming residential damages from construction and installation of an underground concrete drainage canal under a street. Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1973). In that case both the city and the Sewerage and Water Board were found to constitute "proprietors" under 667. Justice Barham in his concurrence objected to the majority's willingness to call anyone a "proprietor" in order to reach a result which broadens the base of liability for damages resulting from hazardous activities which cause damage even with the exercise of due care. The majority had again held that non-proprietors are solidarily liable under 667, and Barham felt that the court should use 2315, analogizing 667-669, or 2315 and 2317, to reach this result. He was of the opinion that parties other than proprietors are not made responsible for non-negligent acts under 667, whereas the majority did not cast liability under any other Code article. Barham felt that non-proprietors could only be cast for damages under the majority's theory of the case if they are negligent.
Lombard sets out the proper analysis for cases under C.C. 667. First, causation must be proved, but to be actionable cause need not be the sole cause, although it must be a cause in fact. In order to be a cause in fact in a legal contemplation, it must have a proximate relation to the harm which occurs, and it must be substantial in character. The court noted that certainty is generally unattainable from testimony produced in court. The law of evidence has long required that the testimony of witnesses be weighed by probabilities. Causation may also be proved by circumstantial evidence, which in many instances is the only evidence by which it can be proved. Circumstantial evidence must exclude other reasonable hypothesis with a fair amount of certainty, but this does not mean that it must negate all other possible causes. Also, saying that the plaintiff must establish a disputed fact by a preponderance of the evidence means that a plaintiff must prove that the existence of the disputed fact is more probable than its nonexistence. Lombard v. Sewerage and Water Board of New Orleans, supra at 913.
Salter v. B.W.S. Corporation, Inc., 290 So.2d 821 (La.1974), involved a situation in *379 which a lessee had a legally cognizable interest and right of action under 667 to enjoin the defendant from using its neighboring property for disposal of chemical waste in underground trenches. The court found that the evidence established the probability that disposal without adequate precautions would pollute the well where plaintiff obtained water, posing a threat to health and safety. Although the operation could be conducted safely and in a manner not violative of the duties of vicinage, since the consequences of failure to exercise great care to prevent escape of poisonous materials were so serious, the court found a qualified injunction appropriate and remanded. The majority cited State ex rel. Violett v. King, 46 La.Ann. 78, 14 So. 423 (1894), which held that a tenant had a right of action to enjoin objectionable aspects of an operation conducted on neighboring property where that operation threatened the health and comfort of the tenant. Also the court noted in Lombard, supra, it was recognized that "proprietor" as used in 667 need not be limited to owners. Again Justice Barham concurred, with Justice Tate joining in the concurrence, and noted that 667 is designed to protect property from the abuse of right of ownership by the works made on a neighboring estate. According to Barham, lessees have only personal rights in immovable leases, and because art. 669 gives the lessee a personal right, the lessee had a right of action.
One of the major cases on this issue was decided in 1975 where damage and depreciation from construction of a gas pipeline was found to violate 667. Hero Lands Company v. Texaco Inc., 310 So.2d 93 (La. 1975). The hazardous, high pressure gas pipeline adjacent (within fifteen feet of the property line) gave rise to an action for damage caused by the proximity which impaired the market value and the full use of the neighboring estate. In this case the court noted that the circumstances of each case determine the applicability of article 667. This court contrasted article 2315 with article 667 and said that "recovery under Article 667 may be granted despite the reasonableness and prudence of the proprietor's conduct, when the work he erects on his estate causes damage to his neighbor." Hero Lands Co. v. Texaco, supra at 97. This decision also goes on to explain the nature of the circumstances which require redress:
"... But the extent of inconvenience the property owner must tolerate without redress depends upon the circumstances. When the actions or works cease to be inconveniences and become damaging is a question of fact. The problem is one which involves the nature of the intrusion into the neighbor's property, plus the extent or degree of damage. No principle of law confines this damage to physical invasion of the neighbor's premisesan extrinsic injury, as it were. The damage may well be intrinsic in nature, a combination of facts and conditions which, taken together, do not involve a physical invasion but which, under the circumstances, are nevertheless by their nature the very refinement of injury and damage." Hero Lands Co. v. Texaco, supra at 98.
The majority also said that violation of 667 is not a tort action in the sense that deliction in its usual connotation is a necessary element. A defendant under 667 must repair damage even though his actions are prudent by usual standards. It is not the manner in which the activity is carried on that is significant; it is the fact that the activity causes damage. Thus, 667 expresses the doctrine of strict liability which does not depend on deliction. Whereas, under 2315, "fault" must be proved, under 667, there is recovery despite reasonableness and prudence if the work causes damage.
Justice Tate concurred in this opinion but disagreed with what he regarded as the dicta that "fault" under 2315 need be distinguished from "fault" derived from 667. Justice Barham, in his concurrence, noted that in the jurisprudence "liability without fault" really means "liability without negligence," and therefore strict liability does not depend on negligence. He said that violation of 667 may constitute delictual action based on fault under 2315; it is fault which does not require proof of negligence.
*380 See Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971). Referring also to Langlois, Barham explained that 2315 "fault" is not limited to negligent acts and intentional misconduct, but also encompasses conduct which, because of its ultrahazardous nature, may cause harm even when the greatest care is exercised.
In 1976 this court dealt with the application of C.C. 667 to damages from chemical emissions from defendant's plant which killed or adversely affected trees on plaintiff's property. Dean v. Hercules, Inc., 328 So.2d 69 (La.1976). After an analysis of the article's history, the court found a one year prescriptive period applicable to 667. The right of ownership is subject to limitations imposed by law, and 667 imposes such a limitation. 2 Aubry et Rau, Droit Civil Francais, § 194 (7th ed. La. State Law Inst. tr. 1966). In prerevolutionary France, these limitations on the right of ownership were regarded as personal obligations founded on the quasi contract of vicinage. The court found that the codification of the sic utere doctrine deals with obligations much broader than the obligations arising from servitude. Yiannopoulos, Civil Responsibility in the Framework of Vicinage: Articles 667-9 and 2315 of the Civil Code, 48 Tul.L.Rev. 195, 203 (1974). The court went on to say that an action for damages for a violation of article 667 is most closely associated with an action for damages based on article 2315. It can be said that a violation of article 667 constitutes fault within the meaning of article 2315. Langlois v. Allied Chemical Corp., supra. In footnote 4 the court notes that Professor Stone pointed out that such an approach finds favor among many of the French commentators. Stone, Tort Doctrine in Louisiana: The Obligations of Neighborhood, 40 Tul.L.Rev. 701, 709 (1966). Also in Langlois, supra, article 667 is cited as an example of liability for fault which does not encompass negligence. Article 667 is not limited in its operation to damage to immovable property. The article seems to encompass liability for personal injuries as well as damage to movable property. Furthermore, in cases involving industrial pollutants, an act of man is required, and therefore no servitude can be acquired by the offending landowner by prescription. C.C. 727.
In one court of appeal case involving damage to oyster beds by allegedly negligent dredging operations, Justice Lemmon in his partial dissent disagreed with the court's holding that the oyster lessee could not recover damages caused willfully, though non-negligently, by the mineral lessee, in the absence of an agreement expressly relieving the mineral lessee of liability for those damages. Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173, 184 (La.App. 4 Cir.1973).
"The mineral lease in this case expressly granted Louisiana Southern the right to dredge canals in connection with its oil exploration. In my opinion the State thereby consented in advance only to reasonable, necessary and skillful dredging and to those changes on the leased premises normally incident to those dredging activities. The phrase `dredging canals' normally denotes the removal of earth, the creation of enlargement of a cavity, and the placement of excavated soil on a spoil bank in proximity to the canal. I do not believe that it is reasonable to infer when a lessor grants the right of `dredging canals' that he thereby consents to any other changes on the leased property or to the damage or destruction of valuable assets, such as oyster beds. These changes and damages are no more normally incident to the dredging of a canal than would be the destruction of crops, buildings or other valuable assets on the leased property.
Therefore, when Louisiana Southern, through its contractor caused damage to the oyster beds within the leased area, a cause of action for recovery of the damage arose in favor of the lessor or its oyster lessee, regardless of the presence or absence of negligence."
This court has also recognized that an oyster lessee has a valuable property right in his oyster beds, for the loss of which he can recover against one whose fault the loss was incurred. Doucet v. Texas Co., *381 205 La. 312, 17 So.2d 340, 341 (1944). Where in Doucet, as here, there were competing interests between the oyster lessee and the mineral lessee, this court found "[i]t was never the legislature's intention to give to the mineral lessees the right to operate or conduct their operations in such a manner as to pollute the waters over these beds and bottoms in utter disregard of the rights of the oyster lessees."
From the foregoing jurisprudence, it is clear that article 667 applies to lessees. There is no reason that co-lessees of the same or adjacent property cannot be neighbors under the language of article 667.
The court of appeal's limiting interpretation of the applicability of article 667 to proprietors and landowners as neighbors is not in keeping with the developing concept of property rights. Professor Yiannopoulos points out that "[t]he suggestion has been made ... that the word `proprietor' should not be given a literal interpretation and limited to `landowner.'" Yiannopoulos, 48 Tul.L.Rev. at 226. See also Yiannopoulos, Violations of the Obligations of Vicinage: Remedies Under Articles 667 and 669, 34 La.L.Rev. 475, 477 (1974).
Professor Stone suggests, "In these days of long term leases, complex mineral rights, and horizontal property divisions it would be a mistake to limit the word `proprietor' to its early nineteenth century connotation, thus ignoring modern developments in property rights." Stone, 40 Tul.L. Rev. at 705.
This court in Langlois v. Allied Chemical Corp., supra at 138, held that "[i]n considering the various activities which create a foreseeable harm to those in the neighborhood, even when conducted with the greatest of prudence and care, the trend has been toward an expansion of the classes of those who are entitled to recovery as well as an expansion of the classes from whom recovery can be had." Although Langlois deals with C.C. 669, the reasoning is applicable to article 667 as well.
Professor Stone discusses the derivation of the terms used in 667 and notes that although the Romans used the term dominium, the holder of land by emphyteusis was also treated in many ways as an owner. Domat used the word propriétaire, but Carbonnier said that the relation of neighborhood (voisinage) a priori can be conceived between tenants (locataires) or between farmers (fermiers) just as well as between owners (propriétaires). In Louisiana "the obligation of art. 667 has been enforced against the holder of a mineral lease ... and against the holder of a long term lease." Stone, 40 Tul.L.Rev. at 704-705, citing Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845 (1955); Devoke v. Yazoo & M.V.R. Co., 211 La. 729, 30 So.2d 816 (1947); McGee v. Yazoo & M.V.R. Co., 206 La. 121, 19 So.2d 21 (1944).
Liability under article 667 has been called strict liability, but strict liability is liability without negligence, not liability without fault. "Fault" in the sense of Langlois encompasses more than negligence, and violation of 667 constitutes fault. Fault under 667 is the damage done to neighboring property, and relief under 667 requires, therefore, only that damage and causation be proved.
The facts of this case clearly establish that the defendants' dredging operation caused damage to the plaintiffs' oyster beds and the oyster production from those beds. Despite the care and prudence exercised by defendants, plaintiffs are entitled to damages for their oyster leases.
Robert Waldron, however, and Robert Waldron, Inc., are neither "neighbors" nor "proprietors" of any sort. Unlike Boh Brothers (the construction contractor) in the Lombard case, and Jenkins Construction Company in the Chaney case, Waldron's activity did not destroy or damage the oyster beds. Waldron was employed by Baber to collect information for him and advise him. Waldron did not dredge the canal, as did Southern Louisiana Contractors (who settled and is no longer a party). The court of appeal was correct as to Waldron when it decided the plaintiffs' had failed to carry their burden of proving liability. The judgment of the court of appeal *382 is affirmed as to defendants Robert Waldron and Robert Waldron, Inc.
As to the other defendants, the judgments of the courts below are reversed, and there is now judgment for the plaintiffs, George Butler, George Butler, Inc. and Leo Bianchini, and against the defendants, Winston Baber, d/b/a Progress Petroleum Company and Highlands Insurance Company declaring defendants liable to plaintiffs for damages to their oyster leases, all at defendants' cost.
Since neither court below reached the issue of damages, the case is remanded to the district court for further proceedings consistent with this opinion.
COLE and WATSON, JJ., concur.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur basing my conclusion on a somewhat different rationale.
A mineral lessee is obliged to repair the damage caused any other person by the lessee's faulty acts in mineral operations. La.Civ.C. art. 2315. Fault in this context is not limited to negligence; it may also consist of a failure to observe a standard of conduct derived by analogy from relevant civil code and statutory principles. Stone, Tort Doctrine in Louisiana, 17 Tul.L.Rev. 159 (1942); Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971). As indicated by the majority opinion, the obligations of a landowner to his neighbors are particularly relevant to determining the duties owed by a mineral lessee to other nearby landusers. La.Civ. C. arts. 667-669. However, these articles cannot be applied literally or directly but must be applied by analogy to determine whether the mineral lessee is to be held responsible under a definition of fault that is comparable to the strict liability of a landowner under Articles 667-669. Stone, Tort Doctrine in Louisiana, supra; Langlois v. Allied Chemical Corp., supra.
Moreover, in formulating standards of strict liability in this manner, a court should conduct an objective search for a rule to govern the case; looking for analogies among codal and statutory rules, principles, concepts or doctrines; and taking into account all of the social, moral, economic and other considerations that an objective rule maker would consider in forming a rule to govern the case. See Bell v. Jet Wheel Blast, Division of Ervin Industries, 462 So.2d 166, 170 (La.1985); Geny, Methode d'Interpretation Et Sources En Droit Privé Positif §§ 155, 156 (Trans.La. St.Law Inst.1954); Cardozo, The Nature of the Judicial Process (1921); Cueto-Rua, Judicial Methods of Interpretation of the Law, 80-81 (footnotes omitted), copyright by the Paul M. Hebert Law Center Publications Institute (1981); Entrevia v. Hood, 427 So.2d 1146 (La.1983); Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971). Accordingly, there are several highly relevant precepts, in addition to those expressly referred to in the majority opinion, which must be considered by the court in determining the standard of liability to be applied in this case.
The mineral code contains several provisions which should be applied by analogy in formulating the rule. "The owner of land burdened by a mineral right and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other". La.R.S. 31:11. Since the oyster lessee in the present case derives his rights directly from the owner and stands in the same position, this precept and any commentary thereon or interpretation thereof is analogous and may be applicable. The "reasonable regard" principle of Mineral Code art. 11 is intended to provide a flexible formula governing the relationship between the mineral servitude owner and the owner of the servient estate. Accordingly, each party must exercise his rights to use the land with reasonable regard for those of the other. It should permit concurrent uses of land by the owner of mineral rights and the owner of the land and those deriving use rights from him. Note, Reasonable Regard: A Solution To The Lignite Problem, 43 La.L.Rev. 1239, 1244 (1983). Significantly, the standard does not attempt to suggest that rights and liabilities must always be based *383 on negligence. Mineral Code art. 11, Comment; Broussard v. Northcott Exploration Co., Inc., 481 So.2d 125 (La.1986); Ashby v. IMC Exploration Co., 496 So.2d 1334 (La.App.3d Cir.1986), affirmed 506 So.2d 1193 (La.1987); Morgan, Correlative Rights: Surface Owner vs. Mineral Owner, 26 Inst.Min.Law 141, 155 (1979).
Moreover, under the mineral code, when the owner of a mineral servitude exercises it, "he is entitled to use only so much of the land as is reasonably necessary to conduct his operations. He is obligated, insofar as practicable, to restore the surface to its original condition at the earliest reasonable time.". La.R.S. 31:22. Article 22 has been applied between the landowner and the mineral lessee, and the reasonableness standard utilized therein is similar to that applied under article 11. Thus, the principle of article 22 may be applied by analogy to resolve disputes between mineral lessees and competing surface users deriving their rights from the land owner. Note, Reasonable Regard: A Solution To The Lignite Problem, 43 La.L.Rev. 1239, 1244 (1983).
Additionally, consideration should be given to the substantial body of jurisprudence and scholarly commentary discussing the civil code, mineral code and other sources in land use disputes. See, e.g., Comment, Concurrent Right to Surface Use in Conjunction with Oil and Gas Development in Louisiana, 33 La.L.Rev. 655 (1973); Note, Reasonable Regard: A Solution To The Lignite Problem, 43 La.L.Rev. 1239, 1244 (1983); Morgan, Correlative Rights: Surface Owner vs. Mineral Owner, 26 Inst. Min.Law 141, 155 (1979); Hall, Priorities and Liabilities For Using the Lease Premises: The Oil Operator and Concurrent Users, 18 Inst.Min.Law 3 (1971). Several auxiliary precepts useful in implementing the codal principles have been developed or suggested for adaptation. For example, it has been observed that other jurisdictions have applied the "doctrine of accommodation" which requires that where there are alternative methods practiced in the industry on similar lands put to similar uses which are usual, customary, and reasonable, and such methods do not interfere with the existing uses of the surface owner, these methods should be implemented. If there is a "reasonable alternative", the mineral lessee must not employ interfering methods or manners of use of the leasehold. See Note, Reasonable Regard: A Solution To The Lignite Problem, 43 La.L. Rev. 1239, 1244 (1983); Getty Oil Co. v. Jones, 470 S.W.2d 618 (Tx.1971); Pennington v. Colonial Pipeline Co. 260 F.Supp. 643 (E.D.La.1966); aff'd, 387 F.2d 903 (5th cir), modified on other grounds, 400 F.2d 122 (5th Cir.1968).
Furthermore, consideration should be given to whether the parties derogated by their contracts from the standard of liability that would otherwise be formulated by interpreting the codal and statutory principles. For example, the landowner in a prior recorded mineral lease may have expressly or impliedly renounced his right to certain surface uses, thus effectively depriving a subsequent surface lessee of any right against the mineral lessee. On the other hand, such a renunciation of right or privilege by the landowner may be expressly or impliedly forbidden and rendered null if it is in conflict with a law enacted for the protection of the public interest. La.Civil Code Article 7; Id., Revision Comments 1987. One such rule of law having a great potential for application is Article IX § 1 of the 1974 Louisiana Constitution which recognizes that the state is required to act as public trustee for its people for the protection, conservation and replenishment of all natural resources. This provision specifically lists air and water as natural resources, commands protection, conservation and replenishment of them insofar as possible and consistent with health, safety and welfare of the people, and mandates the legislature to enact laws to implement this policy. Save Ourselves, Inc. v. La. Environmental Control Commission, 452 So.2d 1152 (La.1984). Even if this constitutional environmental protection standard does not require nullification of a contractual provision in a particular case, it contains important elements which should be considered by the courts in formulating the standard of liability, along with the codal, *384 statutory and secondary sources discussed earlier.
Application of these precepts, leads to the same conclusion as that of the majority opinion. The mineral lessee should be held responsible for the damages caused by its unwarranted interference with the rights of the oyster lessee. It is my appreciation that the mineral lease was a standard contract and that the state did not renounce therein its right to harvest oysters that it subsequently leased to the oyster lessee. It appears that the mineral lessee feasibly could have conducted its operations without doing serious damage to the oyster beds by selecting an alternate site for the canal or by adopting an alternate design for the canal and by dredging, backfilling and plugging more competently. Accordingly, the mineral lessee had reasonable alternative. means by which it could have exercised its mineral rights without causing substantial damage, as opposed to mere inconvenience, to the oyster lessee's rights. Failure to pursue these alternative means created a breach in its legal duty to exercise reasonable regard for the rights of its fellow lessee neighbor.
NOTES
[1] Bianchini sold most of the leases involved in this case to his adopted son George Butler in 1977 but maintained joint ownership with Butler to two of the leases. Butler sold all but one of the leases to Dr. Hugh Champagne in 1979 but reserved his rights to any cause of action arising from defendant's drilling and dredging operations in Wilkinson Bay.
[2] C.C. 659, the introductory article to "Legal Servitudes," states: "Legal servitudes are limitations on ownership established by law for the benefit of the general public or for the benefit of particular persons." C.C. 659 was new, but was not intended to change the law. Revision Comments, 1977. Sections of Act 514 of 1977 declared: "Articles 665, 667, 668, 669, 707 of the Louisiana Civil Code of 1870 ... are not amended or repealed by the provisions of this act." These articles were not renumbered. Since there was no revision of Articles 667, 668 and 669, they are to be interpreted consistently with the jurisprudence.