532 So.2d 887 (1988)
Inez STREET
v.
EQUITABLE PETROLEUM CORPORATION and Energy Corporation of America.
No. 88-CA-209.
Court of Appeal of Louisiana, Fifth Circuit.
October 12, 1988.
*888 Halpern & Daigle, P. Keith Daigle, Charles V. Cusimano, Metairie, for defendants-appellants.
Frank V. Zaccaria, Jr., Robert Badger, Gretna, for plaintiff-appellee.
Before CHEHARDY, C.J., and BOWES and GRISBAUM, JJ.
CHEHARDY, Chief Judge.
This is an appeal by defendants, Equitable Petroleum Corporation (Equitable) and Energy Corporation of America (Energy), from a judgment in favor of plaintiff, Inez Street, for damages to plaintiff's property as a result of an oil spill. We affirm.
On appeal, defendants assert the trial court erred in finding them liable under a negligence or strict liability theory of recovery. Defendants also contend plaintiff failed to prove and/or mitigate her damages.
Plaintiff is the owner of a fishing camp located near Three Bayou Bay, 12 miles from Lafitte, Louisiana. The only access to the camp is by boat or air, and plaintiff maintains several boats at the camp for her and her family's transportation and fishing activities. Plaintiff resides at the camp 90 to 95 percent of the time, although she maintains a home in Marrero, Louisiana. She is married, but her husband is out of town frequently and she spends her time at the camp fishing, crabbing, and raising ducks and geese.
Defendants are the owners of an oil well production facility (referred to as a tank battery), which is located on state-leased marshland approximately one-half mile from plaintiff's camp. The tank battery platform consists of two storage tanks, a heater-treater plant, several pipelines, a wooden walkway between the pieces of equipment and a fire break. The facility produces oil by pumping it from the well into the heater-treater, which separates water from the oil and then pumps the oil into one of two storage tanks. Pipelines feed the oil into the various containers.
On the morning of June 16, 1982, Nicolas Pizzuto, who was on board a shrimping trawler, noticed oil gushing from a pipe beneath the defendants' tank battery platform. The oil was spilling into the water of the bayou, so Pizzuto drove to plaintiff's nearby camp to see if she had a two-way radio he could use to report the spill. While there he informed her the oil was heading in the direction of her camp. Since plaintiff did not have a two-way radio, Pizzuto proceeded to the Texaco Company headquarters located nearby to inform them of the spill. After Pizzuto departed, plaintiff drove her boat to the area to inspect the spill and to assess the potential danger to her camp.
The next morning, June 17, 1982, Donald Hebert, defendants' production manager, was notified by someone at Exxon Corporation that a Texaco employee reported an oil spill and fire at the Three Bayou Bay facility. (Exxon had sold the tank battery plant to defendants a short time before.) Hebert immediately notified the Coast Guard and went to inspect the plant by airplane. His inspection revealed the facility was smouldering and the heater-treater was overturned. He also saw oil covering areas of the marsh and the surface of the water.
Following his inspection, Hebert flew to another company work area in the vicinity where he commandeered a work crew to extinguish the fire, raise the heater-treater and begin the oil spill cleanup. The defendants were later fined $1,000 by the Coast Guard, pursuant to federal law, for the spill, estimated by the Coast Guard to have consisted of 30 barrels of oil. Despite the fine, however, no fault was assessed by the Coast Guard authorities against defendants.
The oil spill was cleaned up in approximately six days. In the meantime the current carried some of the oil to plaintiff's camp area. As a result, she filed suit *889 against defendants for damages she claimed to have sustained.
A bench trial of the matter was held on November 25, 1985, June 17, 1986, July 28, 1987 and July 29, 1987. Following submission of post-trial memoranda, judgment was rendered in plaintiff's favor for damages to her property in the amount of $7,120.
On appeal defendants first contend the trial judge erred in his finding of liability because the evidence fails to support a finding of negligence. Further, defendants assert strict liability is inapplicable under LSA-C.C. arts. 2315 or 667. In this regard defendants argue plaintiff failed to prove a defect under LSA-C.C. art. 2317 and asserts the jurisprudence holds that C.C. art. 667 only applies to ultrahazardous activities.
A finding of negligence requires proof that (1) defendants' conduct was a cause in fact of the harm; (2) defendants owed a legal duty to plaintiff which encompassed the particular risk of harm; (3) defendants breached their duty to plaintiff; and (4) plaintiff was damaged by defendants' breach of duty. Stadler v. Agard, 503 So.2d 112 (La.App. 5 Cir.1987).
In order to recover under strict liability based on C.C. art. 2317, plaintiff must prove the thing which caused the damage was in the care (or custody) of defendants, the existence of a defect or vice of the thing, and the damage was caused by this defect or vice. Loescher v. Parr, 324 So.2d 441 (La.1975); Landry v. State, 495 So.2d 1284 (La.1986). A defect within the meaning of strict liability is that which creates an unreasonable risk of harm. Loescher, supra. Whether or not the risk of harm is unreasonable depends upon the court's analysis of the facts and law wherein it must weigh the magnitude and the probability of injury against the burden of preventing the risk of harm. Entrevia v. Hood, 427 So.2d 1146 (La.1983). In applying the law to the facts of each particular case, the court should consider the moral, social and economic values, as well as the ideal of justice, in reaching an intelligent and responsible decision. Entrevia, supra.
Relief under C.C. art. 667 has also been held to express the doctrine of strict liability which is not dependent upon deliction. Hero Lands Company v. Texaco, Inc, 310 So.2d 93 (La.1975).
C.C. art. 667 provides:
"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
However, in Butler v. Baber, 529 So.2d 374 (La.1988), our Supreme Court recently distinguished Article 667 from strict liability. The court in Butler stated that strict liability is liability without negligence, not liability without fault, which, under Loescher, is a broader term and which is the basis for relief under Article 667. As the court explained, a violation of Article 667 constitutes fault within the meaning of C.C. art. 2315. But, unlike other actions based on Article 2315, a violation of Article 667 does not require proof of negligence, because the fault is the damage done to neighboring property. Thus, the court concluded relief under Article 667 requires only proof of damage and causation, and the care and prudence exercised by defendant is irrelevant in determining liability under this article.
Although caselaw exists which supports defendants' contention that the article only applies to ultrahazardous activities, the Butler case does not buttress that limitation. In Butler the plaintiffs' oyster beds were destroyed by defendant's nearby dredging activities and it was nowhere indicated that the dredging operations were inherently dangerous or ultrahazardous. See also St. Martin v. General Homes-Louisiana, 467 So.2d 1361 (La.App. 5 Cir. 1985); Acadian Heritage Realty v. City of Lafayette, 434 So.2d 182 (La.App. 3 Cir. 1983). Consequently we find Article 667 is applicable to this case, and upon proof of damage and causation, pretermits a determination of negligence or strict liability under C.C. art. 2317.
*890 The facts herein show that the oil from defendants' facility spilled into the bayou and thereafter found its way to plaintiff's camp. Once there, plaintiff testified, the oil adhered to her boats (three wooden pirogues, an aluminum flatboat and a fiberglass skiff), to the shells under and around the camp, and to her ducks and geese. She stated as a result 279 of her ducks and geese died because the oil could not be removed, despite washing with a mild grease-cutting soap. She further claimed her boats had to be discarded and replaced because the oil softened the wood of the pirogues and because it could not be removed from the other boats. Plaintiff additionally alleged the oil left a residue and smell which settled on the exterior and interior walls of the camp, her linen, three mattresses, the carpet, clothing and a gas generator. Because she was unsuccessful in removing the "gooky stuff" and the odor, plaintiff stated she discarded those items, except for some clothing, and ultimately replaced the carpet, mattress and generator. She testified the interior walls of the camp were eventually covered with plywood because, despite cleaning, paint would not adhere to the wood. Plaintiff's testimony was supported by her aunt, Sylvia Malone, and her son, Clifton Street.
Defendants attempted to rebut plaintiff's claim for damages through the testimony of the clean-up supervisor, Anthony Acosta, and through the testimony of Norman Parker, an expert in environmental and geotechnical engineering. Acosta claimed he visited the camp in order to assist plaintiff in cleaning the oil from the area. Although he admitted oil had accumulated in the area on shells and in "potholes" behind the camp in the marsh, he stated plaintiff did not complain about the interior of the camp and further told him she lost only a few baby ducks from the oil spill.
Parker testified from a theoretical viewpoint. He did not see the area until November 1985, at which time he examined the manner in which the water moved in the area, the soil conditions, the conditions around the heater-treater and the area surrounding plaintiff's camp. He stated his investigation showed the area has a two-tide system, that the water movement is directly influenced by wind and velocity and that the land vegetation was in good condition.
Parker next described the composition of oil and the manner in which its components "break up" when oil is released into the water. He stated when this occurs the lighter materials evaporate, some of it turns into "mousse" (a heavy thick material), some goes into solution (dissolved in the water), and some materials enter the sediment. Parker said he analyzed the spill at issue based on a worse case scenario of 250 barrels of oil being released into the water with no fire to burn off some of the oil. Considering the oil components and the manner in which they chemically separate, he concluded even under the worse case scenario it was impossible for plaintiff to have suffered the damages she claimed, except to the ducks and geese, because there is no reason oil cannot be removed from surfaces and because oil does not leave a residue, vapor or odor which could have damaged the camp or its contents.
A trial court's factual findings are given great weight on appellate review and may not be modified absent a finding of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). In this case the trial judge concluded plaintiff proved by a preponderance of the evidence that she suffered the damages she claimed and that those damages were caused by the oil spill. After our review we find no manifest error in these findings. However, this does not dispose of the case because alternatively defendants contend the spill was an act of God which relieves them of liability.
In this regard defendants presented the testimony of John Cordero, a consulting meteorologist. Cordero testified to the weather conditions existing at Three Bayou Bay on June 16 and 17, 1982. He stated the records showed several heavy thunderstorms traveled through the area from 1:35 p.m. through 11:30 p.m. On June 16, 1982, Cordero also testified there were indications of cloud-to-ground-type lightning (which can exist up to 15 miles from the *891 site of a thunderstorm) during the storms passing through the area. Based on the weather records, and assuming the tank battery was the highest object in the area, he concluded it was probable that lightning struck the tank causing it to spill the oil.
The trial judge chose to disregard defendants' defense of act of God. Considering the fact that no physical evidence or testimony was produced to support the theory that lightning struck the tank, coupled with the testimony of Pizzuto, who noticed the spill prior to 1:35 p.m., we cannot say the trial judge was clearly wrong in failing to relieve defendants of liability based on the defense of act of God.
Finally, defendants complain that even if plaintiff suffered the damages she claimed, she had a duty to mitigate those damages. In this regard defendants claimed plaintiff failed to contact an expert on ducks to find out how to remove the oil from their bodies, failed to seek expert advice on removing the oil smell from her clothing, etc., and failed to attempt repairs of her boats and generator. Defendants also assert plaintiff failed to prove the amount of her damages by a preponderance of the evidence.
An injured party has a duty to mitigate only if it is reasonable for him to do so. Barley v. State, Through State Dept. of Hwys., 463 So.2d 689 (La.App. 4 Cir. 1985). We find plaintiff acted in a reasonable manner in this case and that she had no further duty to mitigate her damages.
In regard to the award of damages, the appellate court may not disturb an award of damages by the trier of fact unless it finds an abuse of discretion after an articulated analysis of the facts. Reck v. Stevens, 373 So.2d 498 (La.1979). If an abuse of discretion is found after such an analysis, then the court may resort to prior awards in comparable cases for guidance in fixing the appropriate award. Reck, supra; Capone v. King, 467 So.2d 574 (La.App. 5 Cir.1985), writ denied 468 So.2d 1203 (La. 1985). Even then, the award may only be lowered (or raised) to the highest (or lowest) point which is reasonably within the trial court's discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
The trial judge herein awarded plaintiff $7,120 for her damages. He did not divide the award according to the individual items plaintiff claimed were damaged, so we do not know which items he considered compensable or in which proportionate amount he calculated the award. However, we note that plaintiff's evidence showed the replacement cost for her ducks and geese amounted to $3,121.70, leaving $3,998.30 to account for the rest of her property damages and mental distress. Under these facts and the evidence we do not find the award constitutes an abuse of the trial court's discretion.
Accordingly, the judgment of the trial court is hereby affirmed. Appellants are ordered to pay all costs of this appeal.
AFFIRMED.